# United States Court of Appeals for the Federal Circuit

---

**SALEM FINANCIAL, INC., as Successor-in-Interest to Branch Investments LLC,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
*Defendant-Appellee*

---

2014-5027

---

Appeal from the United States Court of Federal Claims in No. 1:10-cv-00192-TCW, Judge Thomas C. Wheeler.

---

Decided: May 14, 2015

---

RAJIV MADAN, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, argued for plaintiff-appellant. Also represented by CHRISTOPHER PAUL BOWERS, ROYCE TIDWELL, CHRISTOPHER PATRICK MURPHY, NATHAN P. WACKER; MATTHEW JAMES DOWD, SCOTT M. MCCALEB, Wiley Rein, LLP, Washington, DC.

JUDITH ANN HAGLEY, Tax Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by TAMARA W. ASHFORD, GILBERT STEVEN ROTHENBERG, RICHARD FARBER.

———————

Before O'MALLEY, BRYSON, and HUGHES, *Circuit Judges.*

BRYSON, *Circuit Judge.*

Salem Financial, Inc., a subsidiary of Branch Banking & Trust Corporation ("BB&T"), challenges a final judgment of the Court of Federal Claims denying BB&T's claim for a refund of taxes, interest, and penalties. We affirm in part, reverse in part, and remand for further proceedings.

## I

## A

BB&T is a financial holding company chartered under the laws of North Carolina. In 2002, BB&T entered into a transaction with Barclays Bank PLC ("Barclays"), which is headquartered in the United Kingdom. The transaction, known as the Structured Trust Advantaged Repackaged Securities transaction ("STARS"), was in effect for nearly five years, from August 1, 2002, through April 5, 2007.

At issue in this case is the U.S. tax treatment of several aspects of BB&T's involvement in the STARS transaction. When the IRS reviewed BB&T's tax treatment of STARS, it disapproved various tax benefits that BB&T had claimed based on the transaction. In particular, the IRS disallowed foreign tax credits in the amount of $498,161,951.00; it disallowed interest deductions in the amount of $74,551,947.40; it imposed taxes on certain payments from Barclays to BB&T in the amount of $84,033,228.20; it disallowed certain transaction cost deductions in the amount of $2,630,125.05; and it imposed penalties in the amount of $112,766,901.80.

STARS was principally developed by Barclays and KPMG LLP, an international accounting firm. The

original version of the STARS transaction was marketed to non-bank businesses as a means of enhancing investment yield for large, cash-rich corporations located in the United States by taking advantage of differences between the tax systems in the United States and in the United Kingdom. The central component of this early version of STARS was a trust having a U.K. trustee and paying U.K. taxes. The U.S. participant would then realize an economic benefit by claiming foreign tax credits for the U.K. taxes paid by the trust.

In its original form, STARS failed to attract the non-bank entities Barclays had targeted. Those entities responded that the yield enhancement was not high enough to justify the level of complexity and potential risk in the transaction. With that feedback, Barclays combined the original STARS structure with a loan component in order to attract banks. Barclays and KPMG then promoted the new version of STARS as a "low cost financing" program. The economic benefit to the U.S. participant arising from the foreign tax credits remained the same, however, for both the early version and the later version of STARS.

In November 2001, Barclays representatives contacted the head of BB&T's Tax Department regarding the prospect of entering into a STARS transaction. The parties "discussed in some detail [BB&T's] appetite to do a [foreign tax credit] trade." Shortly thereafter, BB&T met with KPMG and Barclays. At the time of that meeting, KPMG had participated in the implementation of STARS transactions between Barclays and two other U.S. banks, and BB&T was aware of that fact. It was proposed that BB&T would form a U.K. trust with its U.S.-based income-generating assets, and Barclays would provide a large loan to BB&T. KPMG and Barclays represented that BB&T would obtain foreign tax credits against its U.S. tax obligations for the U.K. taxes paid by the trust and also share in the tax benefits that Barclays would

obtain from the U.K. based on its participation in the transaction.

The tax risks of STARS were apparent to BB&T from the outset. Those risks included that BB&T might be denied the full amount of the foreign tax credits on its U.S. taxes and that Barclays might be unable to obtain the expected tax benefits from the U.K. After a lengthy negotiation regarding the allocation of the tax risks, BB&T and Barclays reached an agreement and closed the transaction on August 1, 2002.

On KPMG's recommendation, BB&T engaged Sidley, Austin, Brown & Wood LLP ("Sidley") as its tax advisor on the STARS transaction. Sidley issued its tax opinion on STARS in April 2003. In addition, BB&T tasked accounting firm PricewaterhouseCoopers ("PwC"), its outside auditor, with evaluating the tax reserve level of STARS.

B

STARS is a complex transaction consisting of many components. The trial court conducted a thorough analysis of the various structures and steps that made up STARS. We summarize below the most salient aspects of the transaction.

STARS consisted of a trust component ("the Trust") and a loan component ("the Loan"). Although many intermediary entities were created to implement STARS, the real parties in interest at all times were BB&T and Barclays. BB&T created the Trust, to which it contributed approximately $5.755 billion of U.S.-based income-generating assets. The Loan consisted of a payment by Barclays of $1.5 billion in cash to the Trust in return for subscription to three classes of equity interests in the Trust. The Trust, however, remained at all times under BB&T's control, and Barclays was contractually obligated to sell its interests in the Trust back to BB&T for $1.5

billion when the transaction terminated, so the effect of that portion of the transaction was a $1.5 billion Loan from Barclays to BB&T. The interest rate on the Loan was set at a floating rate of approximately one-month LIBOR plus 25 basis points.[1]

BB&T appointed a U.K. trustee for the Trust. The trustee's U.K. residence subjected the Trust's income to U.K. taxation. Pursuant to the STARS agreements, BB&T would receive monthly distributions of the income generated from the assets held by the Trust. After setting aside an amount to pay the U.K. taxes and the management fee, the Trust would remit the remaining funds to BB&T. Before doing so, however, the Trust would temporarily place the distributions into the "Barclays Blocked Account" at BB&T, which would then immediately return those funds to the Trust. That circular movement of the Trust distributions generated a substantial tax benefit for Barclays by allowing it to claim a "trading loss deduction" under U.K. law.

BB&T had the Trust use its funds to pay the U.K. tax on the Trust's income. Barclays would then obtain U.K. tax deductions and credits for almost all of the U.K. taxes paid by the Trust based on Barclays' nominal equity interest in the Trust and the circulation of funds through the Barclays Blocked Account.

As part of the STARS transaction, Barclays would make a monthly payment to BB&T, known as the "Bx payment." The Bx payment was set to be equal to 51 percent of the U.K. taxes paid by the Trust, which had been paid by BB&T and which resulted in the tax benefits

---

[1] LIBOR, short for "Intercontinental Exchange London Interbank Offered Rate," is a benchmark rate that some of the world's leading banks charge each other for short-term loans.

obtained by Barclays. Each month, BB&T's interest obligation under the Loan and Barclays' Bx payment obligation to BB&T were netted against each other. From September 2002 until mid-2005, Barclays, the lender, made net monthly payments to BB&T, the borrower, because the amount of Barclays' Bx payment obligation exceeded the amount of BB&T's interest obligation.

The following example illustrates the cash flows in and out of the Trust based on $100 of Trust income (ignoring fees). The Trust income was subject to U.K. taxation at a 22 percent rate. Therefore, $22 for every $100 of Trust income was set aside for payment of the U.K. taxes, leaving the Trust with $78 after the U.K. tax payment. Because of its nominal equity interest in the Trust, Barclays was also taxed on the Trust income under U.K. law at a corporate tax rate of 30 percent, or $30 for every $100 of Trust income. Barclays, however, was able to claim a $22 U.K. tax credit for the $22 of tax paid by the Trust as an "imputation credit" that partially offset the higher corporate tax imposed on the Trust's distributions. As a result, Barclays effectively paid $8 in U.K. tax.

The Trust distributed the after-tax amount of $78 of Trust income to the Barclays Blocked Account, from which that sum was immediately re-contributed to the Trust. Under U.K. law, Barclays was able to treat the re-contributed $78 as a "trading loss," thereby claiming a trading loss deduction. At the 30 percent tax rate, that deduction was worth $23.40. Barclays' $8 U.K. tax liability was then completely offset by the $23.40 tax deduction, leaving Barclays with a net tax benefit of $15.40.

In the example, the Bx payment that Barclays paid to BB&T, which was predetermined to be equal to 51 percent of the Trust's U.K. tax payments, would be approximately $11. Barclays would then deduct the $11 Bx payment from its U.K. corporate taxes, which at the 30 percent tax rate yielded another tax benefit worth $3.30.

The net benefit to Barclays, for every $100 in Trust income, was thus $7.70, based on U.K. tax credits and deductions (the net tax benefit of $15.40 minus the Bx payment of $11, plus the tax benefit of $3.30 attributable to the deduction for the Bx payment).

For its part, BB&T, having paid the $22 U.K. tax on the Trust income, would claim a foreign tax credit of $22 for the entire amount of the Trust's U.K. taxes. However, having received the $11 Bx payment from Barclays, BB&T would have a net gain of $11.

The U.K. government effectively collected $3.30 in tax for every $100 of Trust income, because the Trust paid $22 in U.K. taxes while the U.K. government gave back $18.70 in tax benefits to Barclays ($15.40 attributable to the trading loss deduction plus $3.30 attributable to the Bx payment deduction). Based on the structure of the transaction and the amount of the income-generating assets in the Trust, BB&T anticipated receiving approximately $44 million per year from the STARS Trust transaction in addition to the revenue generated by the assets themselves.

The capacity of the STARS Trust transaction to generate profits for Barclays and BB&T depended both on Barclays' obtaining the expected tax benefits from the U.K. and on BB&T's obtaining the expected foreign tax credits from the U.S. Because of the risks associated with obtaining those tax benefits, the parties incorporated features into the Trust agreement that were designed to minimize those risks. The agreement included a "make-whole" provision under which BB&T was obligated to reimburse Barclays if the credits generated by the Trust failed to match the parties' expectations. The parties also agreed to an indemnity provision, which would be triggered if the Trust paid no tax, either because it was not treated as a collective investment scheme under U.K. law or because it was not deemed a U.K. resident. BB&T's

indemnity payment to Barclays would be approximately one-half of the U.K. tax that the Trust would have paid. Finally, both parties were entitled to terminate the STARS transaction for any reason, subject to 30 days' notice.

On March 30, 2007, the IRS published proposed regulations entitled "Regulations on Transactions Designed to Artificially Generate Foreign Tax Credits," 72 Fed. Reg. 15081 (proposed Mar. 30, 2007). The comments accompanying the proposed regulations noted that "certain U.S. taxpayers are engaging in highly structured transactions with foreign counterparties in order to generate foreign tax credits," *id.* at 15081, and explained that the regulations were intended to prohibit the use of "highly engineered transactions where the U.S. taxpayer benefits by intentionally subjecting itself to foreign tax," *id.* at 15084. Under the regulations, "an amount paid to a foreign country in connection with such an arrangement is not an amount of tax paid," and as a consequence, "a taxpayer would not be eligible to claim a foreign tax credit for such a payment." *Id.* The notice of the proposed regulation stated that the IRS would analyze STARS transactions entered into before the effective date of the final regulation under anti-abuse doctrines, including the economic substance doctrine. 72 Fed. Reg. 15084 (Mar. 7, 2007). Six days after the issuance of the proposed regulations, BB&T terminated the STARS transaction pursuant to its at-will termination right.

C

BB&T filed corporate income tax returns for the tax years when it was participating in the STARS transaction. In its returns, BB&T claimed foreign tax credits for the Trust's U.K. tax payments and interest deductions for interest it had paid on the Loan. The IRS denied both claims and imposed accuracy-related penalties on BB&T.

BB&T filed suit in the Court of Federal Claims, seeking a tax refund for the items listed above. Following a lengthy trial, the court denied BB&T's refund request in its entirety. *Salem Fin., Inc. v. United States*, 112 Fed. Cl. 543 (2013). Applying the "economic substance" doctrine, the court concluded that the STARS Trust was an economic sham lacking both objective economic reality and a bona fide non-tax business purpose. The court therefore held that the tax consequences of the STARS transactions had to be disregarded.

The court ruled that the Trust component, "where BB&T revenue momentarily is cycled through a U.K. trustee to create U.K. taxes and foreign tax credits, and then is returned to BB&T, quite clearly is an abusive tax avoidance scheme." 112 Fed. Cl. at 549. The court explained that the Trust "creates a series of instantaneous circular cash flows starting and ending with BB&T where no economic activity has occurred abroad to justify the assessment of a U.K. tax. While inarguably sophisticated and creative, the trust purely and simply is a sham transaction accomplishing nothing more than a redirection of cash flows that should have gone to the U.S. Treasury, but instead are shared among BB&T, Barclays, and the U.K. Treasury." *Id.*

The court also denied BB&T's claim for interest deductions on the Loan component of the STARS transaction, based on a finding that the STARS Loan, too, was an economic sham. The court reasoned that the Loan was not structured to make a profit, but instead was devised merely to provide BB&T with a purported business purpose for engaging in the STARS transaction. 112 Fed. Cl. at 587.

The court also examined the Trust and the Loan as part of a single integrated transaction under the economic substance doctrine. It concluded that, viewed as an integrated transaction, the components of the STARS

transaction still lacked economic substance.  112 Fed. Cl. at 588-89.

Finally, the court upheld the accuracy-related penalties assessed by the IRS.  The court found that it was unreasonable for BB&T to rely on tax opinions from KPMG and Sidley, as well as the additional advice from PwC.  The court thus concluded that the tax opinions were ineffective to create a reasonable justification for BB&T's understatements of its tax liability and that the imposition of penalties was proper.  112 Fed. Cl. at 589-94.  This appeal ensued.[2]

## II

The characterization of a transaction for tax purposes is a question of law that is subject to de novo review, while the underlying facts are reviewable for clear error. *Frank Lyon Co. v. United States,* 435 U.S. 561, 581 n.16 (1978).  For purposes of this appeal, BB&T "accepts the trial court's holding that the Trust Transaction and the Loan may be bifurcated."  Appellant's Br. 18.  That is, both sides treat the tax consequences of the Trust and Loan transactions separately, rather than considering

---

[2]    Besides the Court of Federal Claims in this case, the Tax Court in *Bank of N.Y. Mellon Corp. v. Comm'r*, 140 T.C. 15, 42 (2013), has held that another STARS Trust transaction lacks substance, and a preliminary ruling in a district court case involving another STARS transaction has rejected the taxpayer's motion for summary judgment on the business purpose issue.  *Wells Fargo & Co. v. United States*, Civil No. 09-cv-2764, 2014 WL 4070782, at *26-31 (D. Minn. July 22, 2014) (report of special master).  One district court has ruled that the STARS transaction in the case before it did not violate the economic substance doctrine.  *Santander Holdings USA, Inc. v. United States*, 977 F. Supp. 2d 46 (D. Mass. 2013).

them as a single integrated transaction. We accordingly take the same approach and start with the Trust.

## A

The characterization of the Bx payment is important to the resolution of this case. The government argues that the Bx payment is in substance a rebate of the U.K. taxes that BB&T paid on behalf of the Trust. BB&T contends that under the Internal Revenue Code and the Treasury Regulations, the Bx payment must be treated as income to BB&T and not as a tax rebate.

Section 901(i) of the Code provides that payments made to a foreign country that result in a subsidy or rebate to the taxpayer from that country are not creditable taxes. *See* 26 U.S.C. § 901(i)(1)-(2). Under section 901(i),

> Any income, war profits, or excess profits tax shall not be treated as a tax for purposes of this title to the extent – (1) the amount of such tax is used (directly or indirectly) by the country imposing such tax to provide a subsidy by any means to the taxpayer, a related person (within the meaning of section 482), or any party to the transaction or to a related transaction, and (2) such subsidy is determined (directly or indirectly) by reference to the amount of such tax, or the base used to compute the amount of such tax.

*Id.* The pertinent Treasury Regulation provides:

> **(i) General rule**. An amount of foreign income tax is not an amount of income tax paid or accrued by a taxpayer to a foreign country to the extent that—
>
> (A) The amount is used, directly or indirectly, by the foreign country imposing the tax to provide a subsidy by any means (including, but not limited

to, a rebate, a refund, a credit, a deduction, a payment, a discharge of an obligation, or any other method) to the taxpayer, to a related person (within the meaning of section 482), to any party to the transaction, or to any party to a related transaction; and

(B) The subsidy is determined, directly or indirectly, by reference to the amount of the tax or by reference to the base used to compute the amount of the tax.

**(ii) Subsidy**. The term "subsidy" includes any benefit conferred, directly or indirectly, by a foreign country to one of the parties enumerated in paragraph (e)(3)(i)(A) of this section. Substance and not form shall govern in determining whether a subsidy exists. The fact that the U.S. taxpayer may derive no demonstrable benefit from the subsidy is irrelevant in determining whether a subsidy exists.

26 C.F.R. § 1.901-2(e)(3). The government concedes that BB&T received no tax rebate under the literal terms of section 901(i) and the regulation.

Seizing upon the government's concession, BB&T contends that the inquiry regarding the proper characterization of the Bx payment should stop with the literal terms of the Code and regulations. Because the Treasury regulation provides that "substance and not form" determines whether a particular payment is a tax rebate, 26 C.F.R. § 1.901-2(e)(3), BB&T argues that the government's concession that BB&T literally complied with section 901(i) means that BB&T in substance received no tax rebate and thus that BB&T received no tax rebate for purposes of the economic substance doctrine.

We disagree that the existence of the "substance-over-form" provision in the Treasury regulation precludes

analysis under the economic substance doctrine. In *Coltec v. United States*, 454 F.3d 1340 (Fed. Cir. 2006), we concurred with the Third Circuit and the Eleventh Circuit that "economic substance is a prerequisite to the application of any Code provision allowing deductions." *Id.* at 1356 (citing *In re CM Holdings, Inc.*, 301 F.3d 96, 102 (3d Cir. 2002), and *Kirchman v. Comm'r*, 862 F.2d 1486, 1491 (11th Cir. 1989)). We analyzed the transaction at issue in *Coltec* under both the statutory "anti-abuse" provision, which required an inquiry into the substance of the transaction, and "the general economic substance doctrine." *See id.* at 1350-52. The economic substance doctrine thus applies even to a transaction that is governed by a statute or regulation that itself contains a "substance-over-form" provision.

While courts may perform a concurrent substance analysis under both the specific provisions of the Internal Revenue Code and the economic substance doctrine, *see Glass v. Comm'r*, 87 T.C. 1087 (1986); *DeMartino v. Comm'r*, 862 F.2d 400 (2d Cir. 1988), the analysis under the two is not always the same. For example, BB&T offers several reasons why the Bx payment should not be deemed a tax rebate under section 901(i). Those reasons include that neither the Bx payment nor Barclays' trading loss deduction was tied to any payment of taxes, and that Barclays' credit for the U.K. taxes paid by the Trust was an "imputation credit" and thus was not an indirect tax rebate.

Those arguments are highly technical in nature and do not address the broader inquiry under the economic substance doctrine: whether the Trust transactions lack economic reality, whether they lack a bona fide business purpose, and whether they are not the kinds of transactions on which Congress intended to confer the benefit of the foreign tax credit provision. *See Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1375 (Fed. Cir. 2010) (to distinguish between a real transaction and a

sham transaction under the economic substance doctrine, the court examines the economic reality and business purpose of the transaction); *Coltec*, 454 F.3d at 1353 ("The economic substance doctrine represents a judicial effort to enforce the statutory purpose of the tax code.").

BB&T's argument that the inquiry begins and ends with the Code and regulations, if accepted, would largely eviscerate the common-law economic substance doctrine. Challenges to assertedly abusive tax shelters have frequently involved transactions devised to comply with the letter of governing statutes and regulations. As the D.C. Circuit observed, "[a] tax system of rather high rates gives a multitude of clever individuals in the private sector powerful incentives to game the system. Even the smartest drafters of legislation and regulation cannot be expected to anticipate every device." *ASA Investerings P'ship v. Comm'r,* 201 F.3d 505, 512 (D.C. Cir. 2000). Under the traditional economic substance doctrine, the issue in such cases is whether the transactions are contrivances that are inconsistent with the purposes served by the Code provisions and should therefore be disregarded. *See, e.g., Gregory v. Helvering*, 293 U.S. 465, 469-70 (1935). Accordingly, the government's concession that BB&T complied with the literal terms of section 901(i)— although relevant to our consideration of the objective nature of the transaction—does not bar the government from arguing that the STARS transaction is an economic sham.[3]

---

[3]    BB&T also argues that our precedent precludes any further inquiry, beyond section 901(i), into whether there was an "in substance" rebate of U.K. taxes in the STARS transaction. BB&T relies on a group of cases known as the *Mexican Railroad Car Cases*, which were decided before the enactment of section 901(i). In those cases, our predecessor court held that, for purposes of

B

We now turn to the government's arguments under the economic substance doctrine. "The economic substance doctrine seeks to distinguish between structuring a real transaction in a particular way to obtain a tax benefit, which is legitimate, and creating a transaction to generate a tax benefit, which is illegitimate." *Stobie Creek*, 608 F.3d at 1375. "Under this doctrine, we disregard the tax consequences of transactions that comply with the literal terms of the tax code, but nonetheless lack economic reality." *Id.* We have also held that transactions must be disregarded if they are "shaped solely by tax-avoidance features," i.e., if they have no bona fide business purpose. *Id.*; *see also Coltec*, 454 F.3d at 1355.

Ultimately, we have treated the economic substance doctrine as a means to "prevent taxpayers from subverting the legislative purpose of the tax code" by engaging in fictitious transactions with no economic purpose other than the possibility of reaping a tax benefit. *Coltec*, 454 F.3d at 1353; *see Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 543 (5th Cir. 2009) ("The economic substance doctrine allows courts to enforce the legislative purpose of the [Tax] Code by preventing taxpayers from reaping tax benefits from

---

determining the amount of creditable foreign taxes, it was irrelevant that the foreign government later gave a tax rebate to the taxpayer's foreign counterparty. *See Chicago, Burlington & Quincy R.R. Co. v. United States*, 455 F.2d 993, 1022-23 (Ct. Cl. 1972), *rev'd on other grounds*, 412 U.S. 401 (1973); *see also Bankers Trust N.Y. Corp. v. United States*, 225 F.3d 1368 (Fed. Cir. 2000). The *Mexican Railroad Car Cases* and *Bankers Trust* are inapposite here, because neither addresses the applicability of the economic substance doctrine.

transactions lacking in economic reality.").[4] In assessing a transaction's economic substance, "all courts have looked to the objective reality of the transaction." *Coltec*, 454 F.3d at 1356.

We start by examining the "economic reality" of the STARS Trust transaction. This inquiry is conducted based on objective evidence, rather than on the taxpayer's subjective motivation. *Stobie Creek*, 608 F.3d at 1375; *Coltec*, 454 F.3d at 1356. The "economic reality" inquiry asks whether a particular transaction or set of transactions meaningfully altered the taxpayer's economic position, apart from their tax consequences. That inquiry often focuses on whether the taxpayer had a "reasonable possibility of making a profit from the transaction." *Stobie Creek*, 608 F.3d at 1376-77.

BB&T asserts that it realized income from the Trust transaction in the form of the monthly Bx payments. The IRS initially took the same position and treated the Bx

---

[4]    In 2010, Congress codified the economic substance doctrine in 26 U.S.C. § 7701(o). That statute provided that a transaction shall be treated as having economic substance only if "the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position" and "the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction." *Id.* § 7701(o)(1). The statute was made applicable only to transactions initiated after 2010, and it is therefore inapplicable to this case; however, our decisions applying the economic substance doctrine are consistent with the definition Congress adopted in the 2010 legislation, and since Congress in that legislation expressed its intention to codify the existing judge-made rules, our application of those pre-statutory rules is consistent with Congress's endorsement of that approach in 2010.

payments as part of BB&T's gross income. The government has since abandoned that position. It now argues that the Bx payments should be excluded from BB&T's gross income because they are "in substance" rebates of the U.K. tax that was paid by BB&T from the assets BB&T contributed to the Trust.

The government treats the Bx payments as tax rebates based on the theory that the payments derived from Barclays' U.K. tax credits, which in turn derived from the Trust's U.K. tax payment. BB&T contends that the Bx payments should not be characterized as a tax rebate, because they were independent of Barclays' actual receipt of any U.K. tax benefits; Barclays was obligated to make the Bx payments regardless of whether it received the expected U.K. tax credits. BB&T further argues that the Bx payments should be treated as income pursuant to the Supreme Court's decision in *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716 (1929).

We are not persuaded by BB&T's first argument, because the Bx payments were not truly independent of Barclays' U.K. tax benefits. It is true that the amount of the payments was fixed in the transaction documents and was not conditioned on Barclays' actual receipt of any tax benefits. However, the transaction documents provided that an indemnity provision would be triggered if Barclays were unable to claim the expected U.K. tax credits, either because the Trust paid no tax or because the U.K. authority refused to recognize the Trust as a U.K. resident for tax purposes. BB&T would then be obligated to indemnify Barclays for approximately one half of the U.K. tax that the Trust paid, which was roughly equal to the Bx payments. The effect of the indemnity provision was that if Barclays were unable to recover its expected U.K. tax benefits, BB&T would have to return an amount approximately equal to the Bx payments to Barclays. Therefore, the Bx payments were not independent of Barclays' expected U.K. tax benefits at all. BB&T's

ability to benefit economically from the Bx payments depended on Barclays' receipt of its expected tax benefits, which in turn depended on the Trust's U.K. tax payments.

BB&T's second argument—that the Bx payments should be treated as income under *Old Colony* and its progeny—has more force. In *Old Colony*, a taxpayer's employer agreed to pay all income taxes imposed on salary payments to the taxpayer. *Old Colony*, 279 U.S. at 721. The Supreme Court held that the income tax payments made by the employer constituted additional income to the taxpayer (and therefore were not tax effects), even though those payments were made directly to the government. That was because, like the taxpayer's salary, the income taxes were paid "upon a valuable consideration, namely, the services rendered by the employee and as part of the compensation therefor." *Id.* at 729. "The discharge by a third person of an obligation to [the taxpayer] is equivalent to receipt by the person taxed." *Id.*; *see also Diedrich v. Comm'r*, 457 U.S. 191, 197-98 (1982) ("[T]he donor realizes an immediate economic benefit by the donee's assumption of the donor's legal obligation to pay the gift tax . . . . [T]he economic benefit to the donors in the discharge of the gift tax liability is indistinguishable from the benefit arising from discharge of a preexisting obligation.").

Other courts have followed *Old Colony* in assessing a taxpayer's foreign income and tax liability. For example, in *Compaq Computer Corp. & Subsidiaries v. Commissioner*, 277 F.3d 778 (5th Cir. 2001), the Fifth Circuit held that the payment of Compaq's Netherlands tax obligation by Compaq's Netherlands counterparty was income to Compaq. The Eighth Circuit followed the same approach in *IES Industries, Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001).

The government does not appear to dispute that, if Barclays had paid half of the Trust's U.K. tax on BB&T's

behalf, that direct tax payment would have constituted income to BB&T under *Old Colony*. The government argues, however, that the *Old Colony* principle is inapplicable in this case because Barclays did not pay BB&T's U.K. tax directly; rather, it reimbursed BB&T for half of its U.K. tax expense through the Bx payment.

That is a distinction without a difference. The Supreme Court held in *Old Colony* that a third party's assumption of a taxpayer's tax liability constituted income to the taxpayer because the tax payments had been made in consideration of services rendered by the taxpayer, and the taxpayer had realized an economic benefit from the payments. *Old Colony*, 270 U.S. at 729. That principle is not limited to a situation in which a third party paid the taxpayer's taxes directly to the government. Rather, that rationale applies equally if the third party instead reimbursed all or part of the taxpayer's tax expenses in exchange for services rendered.

In *Reading & Bates Corp. v. United States*, 40 Fed. Cl. 737 (1998), the Court of Federal Claims held that a taxpayer realized income when its Egyptian counterparty contractually assumed the taxpayer's Egyptian tax liability pursuant to a tax indemnification provision in their contract. The court recognized that if the contract had provided for the counterparty to reimburse the taxpayer's Egyptian tax expenses, instead of assuming the taxpayer's Egyptian tax liability, the change would not have affected the characterization of the reimbursements as income to the taxpayer; it would have affected only the date the taxpayer would be deemed to have received the income. *Id.* at 750 n.8.

Like the taxpayer in *Old Colony*, BB&T realized an immediate economic benefit by receiving the Bx payments from Barclays, which payments effectively repaid half of BB&T's U.K. tax expenses. The payments were made in consideration of BB&T's services rendered under the

STARS transaction, including BB&T's acts of creating the STARS Trust and subjecting its U.S.-based assets to U.K. taxation. Under the principle of *Old Colony*, the reimbursements that BB&T received from Barclays must therefore be treated as income to BB&T, not tax effects.

The government nonetheless contends that the specific circumstances of this case justify treating the Bx payments as tax rebates. It argues first that the Bx payments are tax rebates because they were designed as such. The government points out that, in assessing the U.S. tax risk of the STARS transaction, BB&T itself referred to the Bx payments as a "Rebate from Barclays." KPMG represented to BB&T that the STARS transaction would provide a "rate reduction of 50% of [the Trust's] UK tax." Barclays likewise stated that the "benefit under STARS arises from the ability of both parties [i.e., Barclays and BB&T] to obtain credits for the taxes paid in the trust."

We do not view this evidence as dispositive for purposes of characterizing the Bx payments. We emphasized in *Coltec* that the economic reality of a transaction must be viewed objectively rather than subjectively. *See Coltec*, 454 F.3d at 1356. The contracting parties' own subjective view of the transaction may be pertinent to the existence of a tax avoidance purpose; however, "all courts have looked to the objective reality of the transaction in assessing its economic substance." *Id.* Furthermore, the government's evidence at best establishes that the Bx payments were designed as a way for Barclays to reimburse BB&T for 50 percent of its U.K. tax expenses. It does not explain why, contrary to the *Old Colony* principle, Barclays' reimbursement of BB&T's tax expense must be deemed to be a tax effect rather than income.

The government next argues that the Bx payment must be treated as a tax rebate because the payment, which was calculated by reference to the Trust's U.K.

taxes, was the product of "tax collusion" between BB&T and Barclays; that is, the two entities used the U.K. government as a "conduit" to cycle BB&T's tax payments to Barclays through Barclays' U.K. tax credit, after which Barclays returned 51 percent of the taxes to BB&T and kept the rest as its fee. The government paints a simple picture: that money merely changed hands from BB&T to the U.K. government, then to Barclays, and finally back to BB&T. The reality, however, is not that simple.

Barclays was willing to make the payment to BB&T because BB&T's participation in the STARS transaction enabled Barclays to realize substantial tax benefits under U.K. law. For every $100 of Trust income, Barclays (1) paid $30 in corporate income tax; (2) claimed a $22 tax credit for taxes already paid by the Trust; (3) claimed a trading loss deduction worth $23.40 for the cash it re-contributed to the Trust; and (4) claimed a deduction for the Bx payments that was worth $3.30. Those payments, credits, and deductions gave Barclays a net total of $18.70 in U.K. tax benefits, out of which Barclays paid $11.00 to BB&T in the form of the Bx payment.

It is not at all clear that the Bx payments were the result of "cycling" BB&T's U.K. tax payments through the U.K. government and Barclays. The Bx payments were paid out of Barclays' net U.K. tax benefits, which consisted of items clearly linked to BB&T's U.K. taxes (such as the $22 tax credit), as well as items unrelated to BB&T's U.K. tax payments (such as the trading loss deduction worth $23.40). Thus, the Bx payments could just as well be said to have been derived from the portion of Barclays' tax benefits that was independent of BB&T's U.K. tax payments, such as the trading loss deduction, as from BB&T's U.K. tax payments. The government's own expert agreed that the real benefit of STARS was the trading loss deduction. It is thus impossible to identify the exact source of the Bx payments, much less to link the Bx payments directly to BB&T's payments of U.K. taxes.

That the Bx payments were calculated by reference to BB&T's U.K. taxes is insufficient to convince us otherwise. Contracting parties are free to structure their transactions based on any payment formula, including calculating a payment by reference to a party's tax liability. *See, e.g.*, *Reading*, 40 Fed. Cl. at 738-39 (pursuant to a drilling contract, a foreign counterparty to the U.S. taxpayer agreed to assume the taxpayer's entire foreign tax liability); *Doyon Ltd. v. United States*, 37 Fed. Cl. 10, 13 (1996), *rev'd on other grounds*, 214 F.3d 1309 (Fed. Cir. 2000) (taxpayer contracted to sell its net operating losses and investment tax credits to unrelated corporations that sought to shelter some of their income from tax liability). Such a tax-based payment formula does not convert income into a tax effect.

We are aware of no authority, and the government has provided none, in which courts have treated private payments as tax effects rather than income simply because the amount of the payments was calculated based on a tax-based formula. The government's position in this regard cannot be squared with prior judicial decisions that have held that even when an unrelated party has paid 100 percent of a taxpayer's taxes, that payment must still be considered income to the taxpayer. *See Old Colony*, 279 U.S. at 729; *Compaq*, 277 F.3d at 784; *IES*, 253 F.3d at 354; *Reading*, 40 Fed. Cl. at 750.

We therefore conclude that the Bx payments should not be characterized as tax effects. Pursuant to *Old Colony* and its progeny, the Bx payments are income to BB&T.

## C

The government next argues that even if the Bx payments are treated as income to BB&T, BB&T realized no profit from the Trust transaction absent the foreign tax credit because the Bx payments must be offset against the Trust's U.K. taxes that were paid by BB&T. The govern-

ment argues that, for every $100 of income from the Trust assets, even if BB&T were credited with $11 income in the form of the Bx payment, that $11 would have to be offset against BB&T's $22 U.K. tax expense, which would yield a loss of $11. According to the government, the Trust transaction produced a net loss and therefore lacked economic substance.[5]

BB&T contends that the government is wrong in seeking to have the Trust's U.K. taxes treated as an item of expense. BB&T relies on *Compaq* and *IES*, two cases with almost identical fact patterns, in which the Fifth and Eighth Circuits rejected a similar argument. *See Compaq*, 277 F.3d at 785; *IES*, 253 F.3d at 354. In *Compaq*, the taxpayer (Compaq) engaged in a foreign transaction involving the purchase and immediate resale of certain publicly traded securities that represented shares of a foreign corporation held in trust by a U.S. bank. The settlement dates for the purchase and sale were arranged so that the securities were purchased *cum* dividend and sold *ex* dividend. The purchase and sale transaction thus generated a gross dividend for Compaq, which was subject to a foreign withholding tax. In addition, because the post-dividend sale price of the securities was lower than the purchase price (by the amount of the dividend, net of the foreign withholding tax), Compaq claimed a capital loss on its U.S. taxes for the transaction. It also claimed a foreign tax credit for the foreign taxes paid on the gross dividend. As a result, the purchase and sale transaction

---

[5] BB&T contends that we should not address this argument because it is raised for the first time on appeal. The record shows, however, that the trial court treated BB&T's U.K. taxes as its "out-of-pocket" cost in assessing the profit from the STARS transaction. Because the trial court addressed this issue, the government's argument is properly before us.

produced a net gain for Compaq after all taxes were taken into consideration. *See Compaq*, 277 F.3d at 782.

The Tax Court found that the transaction lacked economic substance because it was in essence a circular transaction entailing no risk and no prospect for gain other than as a result of the various domestic and foreign tax consequences. *Compaq Computer Corp. v. Comm'r*, 113 T.C. 214 (1999). In short, it was a classic case of cross-border tax arbitrage, and not the kind of transaction that, in the Tax Court's view, Congress intended to benefit through the foreign tax credit statute. *Id.* at 225 ("The foreign tax credit serves to prevent double taxation and to facilitate international business transactions. No bona fide business is implicated here, and we are not persuaded that Congress intended to encourage or permit a transaction such as the [Compaq securities] transaction, which is merely a manipulation of the foreign tax credit to achieve U.S. tax savings.").

The Fifth Circuit reversed. The court held that the gross dividend, rather than the dividend net of the foreign tax, should have been used to compute Compaq's pre-tax profit. *See Compaq*, 277 F.3d at 784. In addition, the court faulted the Tax Court for failing to include Compaq's foreign tax credits in assessing the after-tax profit of the entire transaction. *See id.* at 785. The Fifth Circuit reasoned that "[i]f the effects of tax law, domestic or foreign, are to be accounted for when they subtract from a transaction's net cash flow, tax law effects should be counted when they add to cash flow." *Id.* "To be consistent, the analysis should either count all tax law effects [both foreign tax credits and foreign tax expenses] or not count any of them." *Id.*; *see also IES*, 253 F.3d at 354 (taking the latter approach and treating the gross dividend, not the net dividend, as the economic benefit to the taxpayer).

The transactions at issue in *Compaq* and *IES* involved an almost simultaneous purchase and sale of the securities in question; the purchase price was greater than the sale price by the amount of the dividend received by the taxpayer after foreign taxes on the dividend. The transactions therefore did not meaningfully alter the taxpayers' economic position (apart from their tax consequences); they involved essentially no risk (other than the risk that the transactions would be disallowed for tax purposes); and they offered no opportunity for economic gain (except for the tax benefits). Because of the fees paid in connection with the transactions, the consequence of the transactions, but for the foreign tax credits, would have been a certain loss. Thus, the transactions relied for their profitability entirely on the availability of a U.S. foreign tax credit for the taxes paid to the foreign government.

The *Compaq* and *IES* transactions produced no real economic profit. The taxpayer incurred a loss from the sale of the securities in the amount of the dividend, net of the foreign tax. Any apparent profit from the transactions was the result of offsetting that loss by the amount of the dividend, without taking into account the foreign taxes paid on the dividend. And the fact that the transactions produced a net gain to the taxpayer after taking both the foreign taxes and the foreign tax credit into account says nothing about the economic reality of the transactions, because all tax shelter transactions produce a gain for the taxpayer after the tax effects are taken into account—that is why taxpayers are willing to enter into them and to pay substantial fees to the promoters.[6] The

---

[6] Academic commentators, sometimes referring to the transactions at issue in those cases as a form of "foreign tax arbitrage," have argued that the transactions should have been disregarded as lacking in economic

critical question is not whether the transaction would produce a net gain after all tax effects are taken into consideration; instead, the pertinent questions are whether the transaction has real economic effects apart from its tax effects, whether the transaction was motivated only by tax considerations, and whether the transaction is the sort that Congress intended to be the beneficiary of the foreign tax credit provision.

Our precedent, like that of several other courts, supports the government's approach, i.e., to assess a transaction's economic reality, and in particular its profit potential, independent of the expected tax benefits. For example, in *Rothschild v. United States*, 407 F.2d 404 (Ct. Cl. 1969), our predecessor court examined the economic reality of a transaction by asking whether there was "a

---

substance. *See* Bryan Camp, *Form Over Substance in Fifth Circuit Tax Cases*, 34 Tex. Tech. L. Rev. 733, 752-53 (2003); Mitchell Kane, Compaq *and* IES: *Putting the Tax Back in After-Tax Income*, 94 Tax Notes 1215, 1217 (Mar. 4, 2002); Michael S. Knoll, *Compaq Redux: Implicit Taxes and the Question of Pre-Tax Profit*, 26 Va. Tax Rev. 821, 840 (2007); Michael J. McIntyre, *A Vote in the* Compaq *Debate*, 94 Tax Notes 1716 (Mar. 25, 2002); Daniel N. Shaviro and David A. Weisbach, *The Fifth Circuit Gets It Wrong in* Compaq v. Commissioner, 94 Tax Notes 511 (Jan. 28, 2002); George K. Yin, *The Problem of Corporate Tax Shelters: Uncertain Dimensions, Unwise Approaches*, 55 Tax L. Rev. 405, 407-13 (2002). Professors Klein and Stark argue that the *Compaq* transaction was not really tax arbitrage, but instead was a form of economic arbitrage. Nonetheless, they agree that the absence of risk in the *Compaq* transaction "may well be an adequate reason for ignoring the transaction entirely." William A. Klein & Kirk J. Stark, Compaq v. Commissioner—*Where is the Tax Arbitrage?*, 94 Tax Notes 1335, 1338 (Mar. 11, 2002).

possibility [or] an opportunity of profit to the taxpayer separate and apart from the tax [benefits]." *Id.* at 412; *see also IES*, 253 F.3d at 354 (under the objective economic substance test, the court "will first consider whether there was a reasonable possibility of profit . . . apart from tax benefits"); *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 94 (4th Cir. 1985) ("The second prong of the sham inquiry, the economic substance inquiry, requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefits."). In this case, BB&T incurred a large foreign tax expense ($22 for every $100 of Trust income) only to obtain a smaller income (the $11 Bx payment for every $100 of Trust income). The Trust transaction therefore is profitless before taking into account BB&T's expected foreign tax credits.

With that said, however, we disagree with the government's contention that a transaction's lack of potential for profit before taking U.S. tax benefits into account conclusively establishes that the transaction lacks economic reality. The government argues that a transaction lacks economic reality if it fails to realize a post-foreign-tax profit, i.e., if the pre-tax profit is less than the foreign tax expense. Without foreign tax credits, such a transaction would result in an economic loss. This is in essence the "economic profit" test contemplated in I.R.S Notice 98-5, which was never issued as a regulation and was later withdrawn. *See* I.R.S. Notice 98-5, 1998-1 C.B. 334, 1997 WL 786882 (1997); I.R.S. Notice 2004-19, 2004-1 C.B. 606, 2004 WL 292126 (2004). The rationale for the "economic profit" test was to disallow credits if the "reasonably expected economic profit were determined to be insubstantial compared to the value of the foreign tax credits expected to be obtained" as a result of the transaction. 2004 WL 292126, at *1.

What is critical is to identify transactions lacking economic reality, i.e., those that do not alter the taxpayer's

economic position in any meaningful way apart from their tax consequences, typically entailing no risk and no significant possibility of profit other than as a result of tax considerations. This is to ensure that tax benefits are available only if "there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels." *Frank Lyon*, at 583-84. Even if there is some prospect of profit, that is not enough to give a transaction economic substance if the prospect of a non-tax return is grossly disproportionate to the tax benefits that are expected to flow from the transaction. *See, e.g.*, *Knetsch v. United States*, 364 U.S. 361, 365-66 (1960) (the taxpayer's transaction with the insurance company "was a fiction," because for a claimed interest deduction of $233,297.68, the taxpayer's annual borrowing only kept a net cash value "at the relative pittance of $1,000").

While looking to the potential for economic profit is useful, the Supreme Court has cautioned that there is "no simple device available to peel away the form of [a] transaction and to reveal its substance." *Frank Lyon*, 435 U.S. at 576. The government's economic profit test, if applied rigidly, would implicate a wide range of transactions that, in the government's view, have not earned a minimum profit to justify a finding of economic reality. Yet commentators have identified transactions that would fail the profit test but nonetheless should be honored as legitimate business transactions meriting the allowance of foreign tax credits. *See* Daniel N. Shaviro & David A. Weisbach, *The Fifth Circuit Gets it Wrong in* Compaq v. Commissioner, 94 Tax Notes 511, 515 (2002) ("To be sure, there are many cases where a foreign transaction without a pre-tax profit (net of foreign taxes) is not a sham meriting disallowance.") (giving an example in which a U.S. company borrows at 8 percent to make a genuine invest-

ment, over a significant period, in a foreign bond or business opportunity that is expected to earn 10 percent before foreign tax and 7 percent after foreign tax); James M. Peaslee, *Creditable Foreign Taxes and the Economic Substance Profit Test*, 114 Tax Notes 443, 450 (Jan. 29, 2007) ("On those facts, the taxpayer would have a powerful argument that allowing the [foreign tax] credits is consistent with Congressional intent despite the lack of a post-foreign tax profit."); David P. Hariton, *The* Compaq *Case, Notice 98-5, and Tax Shelters: The Theory Is All Wrong*, 94 Tax Notes 501, 502 (Jan. 28, 2002) (under the government's profit test, "any taxpayer who borrowed money and invested the proceeds in foreign stock would have lost its right to credit any foreign withholding taxes it paid, since its interest deductions would invariably have exceeded its net dividend income").

Transactions involving nascent technologies, for instance, often do not turn a profit in the early years unless tax benefits are accounted for. To brand such transactions as a sham simply because they are unprofitable before tax benefits are taken into account would be contrary to the clear intent of Congress. *See Sacks v. Comm'r*, 69 F.3d 982, 990-92 (9th Cir. 1995) (upholding the taxpayer's claim for regular investment credit and a business energy investment credit, where the taxpayer entered into a sale/leaseback transaction for solar water heaters, and the IRS deemed the transaction as a sham because it was unprofitable before tax benefits were accounted for). Indeed, Congress often provides tax benefits to encourage socially beneficial activity that would not be pursued absent tax advantages.

Therefore, although inquiring into post-foreign-tax profit can be a useful tool for examining the economic reality of a foreign transaction, we disagree with the government that a transaction that fails the profit test must necessarily be deemed a sham. Nonetheless, if a taxpayer has incurred a large foreign tax expense that

would render the transaction unprofitable absent the foreign tax credit, that situation demands careful review of the transaction. In particular, it requires an inquiry into whether the transaction meaningfully alters the taxpayer's economic position (other than with regard to the tax consequences) and whether the transaction has a bona fide business purpose. The fact that the transaction lacks a post-foreign-tax profit does not by itself end the economic substance inquiry.

In this case, the trial court's finding that the Trust transaction lacked economic reality was supported by more than just the absence of a prospect for profit. The trial court found that the Trust transaction consisted of "three principal circular cash flows," which, apart from their intended tax consequences, had no real economic effect. 112 Fed. Cl. at 585. Through those circular cash flows, BB&T (1) created an entity that it used to make monthly distributions to the Trust, which the Trust immediately returned to that entity, resulting in subjecting the income to U.K. taxes; (2) caused the Trust to deposit a predetermined amount of funds into a blocked account and then to withdraw those funds immediately, enabling Barclays to claim a U.K. tax loss even though the transaction had no net economic effect; and (3) "cycled tax through the U.K. taxing authority, then to Barclays, and then back to [BB&T]." *Id.* None of those transactions, the court found, had any economic substance.

As explained above, we do not accept the trial court's characterization of the Bx payment as simply a rebate of the Trust's U.K. tax payments; we agree with the trial court, however, that the Trust transaction was a contrived transaction performing no economic or business function other than to generate tax benefits. The trial court correctly concluded that the income "from BB&T's preexisting assets cycled through the STARS Trust was not [economic] profit from STARS," but was akin to the "transfers of income-producing assets to controlled enti-

ties that do not imbue an arrangement with substance," because "the transfer has no incremental effect on the taxpayer's activities." 112 Fed. Cl. at 586 (citing cases). As the trial court found, the Trust transaction reflected no meaningful economic activity by BB&T: the incremental profit potential of the Trust (beyond the income already generated by the underlying assets) depended entirely on Barclays' and BB&T's anticipated tax benefits; it exposed BB&T to no economic risk (other than the risk that the IRS would challenge the tax treatment of the transaction); and it had no realistic prospect of producing a profit (apart from the effect of the foreign tax credits).

Rather than being a genuine business transaction involving economic risk, the STARS Trust transaction was simply a money machine. By voluntarily subjecting the Trust income to U.K. taxes, BB&T obtained a post-foreign-tax-credit "profit" of $11 for every $100 of Trust income, free of economic risk. If BB&T had increased by ten-fold the value of the assets it placed in the Trust, it would have increased by ten-fold its "profit" from the transaction, quite apart from the legitimate income generated by the assets. In addition, Barclays' gain from the transaction would have increased by the same multiple, as would the U.K.'s receipt of taxes, all at the expense of the U.S. Treasury. The artificiality of the transaction is shown by its unlimited capacity to generate gains, without any additional exposure or commitment of resources. The trial court therefore correctly characterized the transaction as lacking economic reality, and it properly found that allowing foreign tax credits for such an arrangement would be inconsistent with the purposes of the foreign tax credit statute.

## D

We next turn to the second element of the "economic substance" test—whether the STARS Trust transaction nonetheless had a bona fide business purpose. The trial

court found that the STARS Trust had no non-tax business purpose, and that, instead, its sole function was "to self-inflict US-sourced BB&T income in order to reap US and UK tax benefits." That finding is amply supported by the evidence.

"Asking whether a transaction has a bona fide business purpose is another way to differentiate between real transactions, structured in a particular way to obtain a tax benefit (legitimate), and transactions created to generate a tax benefit (illegitimate)." *Stobie Creek*, 608 F.3d at 1379 (citing *Coltec*, 454 F.3d at 1357); *see also Shriver v. Comm'r*, 899 F.2d 724, 726 (8th Cir. 1990) ("The business purpose inquiry examines whether the taxpayer was induced to commit capital for reasons only relating to tax considerations or whether a non-tax motive, or legitimate profit motive, was involved."); *Winn-Dixie Stores, Inc. v. Comm'r*, 254 F.3d 1313, 1316 (11th Cir. 2001) ("The [sham-transaction] doctrine has few bright lines, but it is clear that transactions whose sole function is to produce tax deductions are substantive shams.") (internal quotations omitted).

When BB&T first learned of the STARS transaction, it expressed to Barclays its "appetite to do an FTC [foreign tax credit] trade." During the two parties' subsequent discussions, Barclays represented to BB&T that "[t]he benefit under STARS arises from the ability of both parties to obtain credits for the taxes paid in the Trust." KPMG likewise promoted STARS to BB&T as generating a benefit "based on the U.K. tax credit," in which the greater the amount of Barclays' tax credits, the greater the benefit to BB&T would be.

When the STARS transaction was presented to BB&T's board of directors in February 2002, BB&T's chief financial officer described the expected benefit of the transaction as "one half of UK tax credit received by investor [Barclays] for UK income taxes paid by Trust." A

BB&T witness confirmed at trial that STARS "sounded like a good deal" at the time because it allowed BB&T to claim a foreign tax credit equal to the entire amount of the Trust's U.K. taxes while BB&T was also receiving "a payment from Barclays that they had used the tax credit as a basis for calculating."

BB&T and Barclays finalized the STARS transaction in July and August 2002. What emerged from the parties' agreement was a Trust consisting entirely of BB&T's U.S.-based assets, which BB&T voluntarily subjected to U.K. taxation. Beyond that, BB&T conducted little activity in the U.K. The monthly Bx payment it received, sometimes characterized by the parties as a "[loan] interest adjustment," bore no relationship to the amount of the STARS Loan; instead, the payment was calculated based on the Trust's U.K. tax payments. Aside from income generated by the Trust's assets, all incremental cash flows into the transaction were the U.K. tax benefits that Barclays claimed under STARS.[7]

The evidence thus supports the trial court's finding that the STARS Trust was a "prepackaged strategy" created to generate U.S. and U.K. tax benefits for BB&T and Barclays. *See Stobie Creek*, 608 F.3d at 1379. Barclays agreed to bear half of BB&T's U.K. tax expense under the transaction in exchange for an opportunity to claim substantial U.K. tax benefits for itself (through the trading loss deduction). BB&T, on the other hand, benefited by claiming a foreign tax credit equal to the entire amount of the Trust's U.K. taxes while "getting back one-half of the U.K. tax" from Barclays. Absent those tax

---

[7] Both parties agree that the analysis of the transaction should focus on the transaction's incremental income beyond the income already generated by the Trust assets.

advantages, the STARS transaction would never have occurred.

BB&T contends that the Trust transaction was motivated by valid, non-tax-related business purposes. Significantly, although BB&T argued in the Court of Federal Claims that the purpose of the STARS transaction, including the Trust, was to obtain financing, BB&T does not make that argument in this court. Instead, BB&T argues, first, that it sought to earn a profit, in the form of the Bx payment, and that earning a profit is "a quintessential business purpose, universally accepted by the courts." Appellant's Br. 55. The Bx payment, however, does not represent profit from any business activity; it is simply the means by which Barclays and BB&T shared the tax benefits of the Trust transaction. It therefore is not an indication that the Trust transaction had a business purpose. To hold that a transaction has a bona fide business purpose whenever it has a prospect of producing economic benefit for the taxpayer would eliminate the "business purpose" test altogether, since the taxpayer normally will not engage in a transaction absent the prospect that it will result in some monetary gain.

BB&T next argues that the Trust had a legitimate business purpose because it was established to enable Barclays to claim certain U.K. tax benefits. BB&T relies on *Northern Indiana Public Service Co. v. Commissioner*, 115 F.3d 506, 512 (7th Cir. 1997), for the proposition that accommodating a counterparty's tax position is a legitimate business purpose.

BB&T misconstrues *Northern Indiana*. In that case, it was undisputed that the taxpayer had structured the transaction at issue to access the Eurobond market, where it could borrow at a lower interest rate, and to allow foreign lenders to avoid paying a 30 percent U.S. withholding tax. *See Northern Indiana*, 115 F.3d at 511. The Seventh Circuit found that the desire to avoid the 30

percent withholding tax was not the taxpayer's sole purpose in structuring the transaction, and that the taxpayer's foreign counterparty had "engaged in business activity of borrowing and lending money at a profit," which had resulted in "actual, non-tax related" changes in the taxpayer's economic position. *Id.* at 509, 512. The court held that such a transaction should not be disregarded as an economic sham simply because tax avoidance was one of the motives for creating or structuring the transaction. *See id.* at 511, 514. *Northern Indiana* thus does not stand for the proposition that accommodating a counterparty's tax position is always a legitimate business purpose, as BB&T asserts.

The Seventh Circuit in *Northern Indiana* recognized that a transaction that is "unrelated to any economic activity" and is created solely to obtain tax benefits should be disregarded as a sham. 115 F.3d at 511. The creation and operation of the STARS Trust is just such a transaction. The incremental profit potential of the Trust depended entirely on Barclays' and BB&T's anticipated tax benefits. The risk of the transaction rested on "interpretations of tax laws and regulations of the United States, the United Kingdom and the State of North Carolina"; the risk was unrelated to market conditions, "the time value of money," or the "attendant risks" associated with the transaction. *See Bank of N.Y. Mellon Corp. v. Comm'r*, 140 T.C. 15, 42 (2013) (discussing another STARS transaction). Thus, while the transaction before the court in *Northern Indiana* was a "real transaction [that was] structured in a particular way to obtain a tax benefit," the STARS Trust was created solely to generate tax benefits; it therefore lacked a bona fide business purpose.[8] *Stobie*

---

[8] BB&T further argues that saving state taxes with the STARS Trust is a legitimate business purpose. BB&T avoided North Carolina state tax by shifting the Trust's

*Creek*, 608 F.3d at 1379; *see also Northern Indiana*, 115 F.3d at 512 (recognizing that *Knetsch* and similar cases "allow the Commissioner to disregard transactions that are designed to manipulate the Tax Code so as to create artificial tax deductions").

We recognize that most of the "business purpose" cases have dealt with transactions created solely to generate U.S. tax benefits. The STARS Trust is unusual in that it was structured to generate both U.S. and U.K. tax benefits, which were then allocated between the two participating entities. That fact, however, does not change our conclusion regarding the absence of any business purpose underlying the Trust transaction.

Allowing credits for taxes paid to other sovereigns "is a privilege and a matter of Congressional grace." *Federated Mut. Implement & Hardware Ins. Co. v. Comm'r*, 266 F.2d 66, 70 (8th Cir. 1959); *see also Chrysler Corp. v. Comm'r*, 436 F.3d 644, 654 (6th Cir. 2006). Thus, the ultimate question is "whether what was done, apart from the tax motive, was the thing which the statute intended." *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Coltec*, 454 F.3d at 1355-56. The enactment of the foreign tax credit statute "indicates appreciation of the practical exigencies which lead to the foreign incorporation of subsidiaries for the extension by domestic corporations of their business

---

income-producing assets from North Carolina to Delaware. In *Coltec*, we held that "the transaction to be analyzed [under the economic substance doctrine] is the one that gave rise to the alleged tax benefit." *Coltec*, 454 F.3d at 1356. At issue in this case is BB&T's claimed foreign tax credit, which did not arise from BB&T's domestic relocation of assets. Therefore, BB&T's asserted business purpose regarding its state tax savings fails because it "focuses on the wrong transaction." *Id.* at 1358.

abroad." *Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 9 (1932).

The foreign tax credit system aims to achieve "capital export neutrality," thereby removing a possible disincentive to engage in foreign trades because of the burden of double taxation. *See* 56 Cong. Rec. App. 677 (1918) (statement of Rep. Kitchin) ("We would discourage men from going out after commerce and business in different countries if we maintained this double taxation."); Richard E. Andersen, *Foreign Tax Credits* 1-2, 5 (1996); *Hart v. United States*, 585 F.2d 1025, 1029 (Ct. Cl. 1978) ("The purpose of allowing the credit was to avoid the inequity of double taxation of foreign source income."). In other words, the foreign tax credit was intended to remove the effect of foreign taxation from an investor's decisionmaking process and to facilitate purely economic decisions regarding business opportunities overseas. *See* Elisabeth A. Owens, *The Foreign Tax Credit* 3 (1961) ("[T]he result of the operation of the [foreign tax] credit is that United States corporations . . . with the same amount of income bear an equal total tax burden on income whether or not they are subjected to foreign income taxation."); Andersen, *supra*, at 1-2. An elaborate scheme set up solely to take advantage of a foreign tax system and involving no "economically-based business transactions" is not the type of transaction Congress intended to promote with the foreign tax credit system. *See Northern Indiana*, 115 F.3d at 512.

Although BB&T received income in the form of the Bx payment, the transaction that generated that income involved no genuine business activities, and the transaction that produced the Bx payment would not have been engaged in but for the system of taxes imposed by the U.S and U.K. governments. *See Northern Indiana*, 115 F.3d at 512. Congress could not have intended to allow a taxpayer to claim a foreign tax credit, at the expense of U.S. tax revenue, for a transaction involving no commerce

or bona fide business abroad and having no purpose other than to obtain foreign and domestic tax benefits. *See Goldstein v. Comm'r*, 364 F.2d 734, 742 (2d Cir. 1966) ("[T]o allow a deduction for interest paid on funds borrowed for no purposive reason, other than the securing of a deduction from income, would frustrate [the legislative] purpose . . . [and] would encourage transactions that have no economic utility but for the system of taxes imposed by Congress.") (citing *Knetsch v. United States*, 364 U.S. 361, 367 (1960)).

We therefore sustain the trial court's finding that the STARS Trust lacked a bona fide business purpose. The tax consequences of the STARS Trust accordingly must be disregarded.[9] *See Stobie Creek*, 608 F.3d at 1375.

E

BB&T further alleges that the trial court committed legal error by questioning the U.K. government's imposition of taxes on the Trust. Specifically, BB&T argues that the "act of state" doctrine bars the trial court from reconsidering the U.K.'s imposition and collection of income taxes from the Trust, and that such reconsideration conflicts with the express allocation of tax jurisdiction in the U.S.-U.K. Tax Treaty, 2224 U.N.T.S. 247 (July 24, 2001).[10] We do not read the trial court's determination of

---

[9]     BB&T also argues that if the Bx payment were to be treated as an "in-substance" tax rebate, BB&T should be allowed to claim forty-nine percent of the foreign tax credits because the Bx payment rebated only $51 of every $100 of U.K. taxes paid on the Trust. Because we disagree that the Bx payment should be deemed as a tax rebate, we need not address that argument.

[10]     The act of state doctrine "requires that, in the process of deciding, the acts of foreign sovereigns taken

the economic substance of STARS to depend in any way on a repudiation of the U.K.'s authority to impose taxes on the Trust. Nor do we base our decision on such a determination. We therefore do not find BB&T's argument as to the Treaty or the act of state doctrine to be persuasive.

## III

Aside from the foreign tax credits arising from the STARS Trust, BB&T also seeks to recover deductions for the interest it paid on the $1.5 billion STARS Loan. The trial court disallowed the interest deductions, holding that the Loan, like the Trust, lacked economic substance. The court based its decision primarily on two grounds. First, it emphasized that, putting aside the Bx payment, the cost of borrowing for the STARS Loan was "significantly higher than rates on comparable sources of available funds." 112 Fed. Cl. at 587. The court thus concluded that the STARS Loan was not the sort of financing transaction a large commercial bank such as BB&T would normally engage in. Second, the court found that the Loan had no non-tax business purpose, but "simply was a method by which to camouflage Barclays' rebate of a portion of BB&T's UK payments, through [the Bx] payment." We reach a different conclusion regarding the economic substance of the STARS Loan transaction.

Section 163(a) of the Internal Revenue Code, 26 U.S.C. § 163(a), permits the deduction of "all interest paid or accrued within the taxable year on indebtedness." The statute speaks in broad terms. *See Coors v. United States*, 572 F.2d 826, 831 (Ct. Cl. 1978); *Goldstein*, 364 F.2d at 741. It "does not contain any general requirement that interest payments, to be deductible, be ordinary, neces-

within their own jurisdictions shall be deemed valid." *Voda v. Cordis Corp.*, 476 F.3d 887, 904 (Fed. Cir. 2007).

sary, reasonable or for a business purpose." *Coors*, 572 F.2d at 831. Nevertheless, "[i]f a transaction underscoring interest payment is considered to be a sham . . . said payments are not allowed as interest deductions." *Id.* at 832.

Our predecessor court noted that cases dealing with interest deductions generated by loan transactions that are challenged as having no prospect for economic gain lack uniformity. *See Rothschild*, 407 F.2d at 408. However, the court explained that the "common denominator to be found in those cases denying the interest deduction is the conclusion that the loan transaction could not appreciably affect the tax payer's beneficial interest except to reduce the taxpayer's federal income tax." *Coors*, 572 F.2d at 837; *see also Lee v. Comm'r*, 155 F.3d 584, 586 (2d Cir. 1998) ("Interest payments are not deductible if they arise from transactions that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences.") (internal quotation and citation omitted); *see also Knetsch*, 364 U.S. at 366 (disallowing tax deductions when "it is patent that there was nothing of substance to be realized by [the taxpayer] from this transaction beyond a tax deduction").

The government contends that the STARS Loan lacked economic reality because, absent the Bx payment, BB&T had effectively borrowed the Loan funds at an interest rate that was more than 30 basis points higher than the rates on comparable sources of funding available to BB&T. The government thus asserts that the STARS Loan provided no economic benefit to BB&T (other than tax benefits) because the proceeds of a loan from another source would have yielded the same return at a lower cost.

The government relies on *Kerman v. Commissioner*, 713 F.3d 849 (6th Cir. 2013), for the proposition that a loan transaction is "economically unreasonable" if alter-

native, lower-interest funding sources were available to the taxpayer. We do not interpret *Kerman* as standing for that broad proposition or as being otherwise helpful to the government's argument in this case.

While the Sixth Circuit scrutinized the "absurdly high interest rate" of the loan transaction in *Kerman* (7000 basis points above market rate), it did not find the transaction to be a sham based solely on the interest rate. Rather, the court examined the cost and returns of the loan transaction and found that, but for the claimed tax benefits, the transaction would have resulted in a sure loss. *See* 713 F.3d at 865 ("[R]egardless of what investment Kerman planned to use the loan proceeds for (if any), financing with [the loan] transaction did not provide him with a reasonable possibility of profit."). The *Kerman* court thus did not hold that a higher-than-market-rate interest or the availability of alternative, lower-interest funding alone established that the underlying loan transaction was a sham; rather, it engaged in the same inquiry that the *Rothschild* court did, asking whether there was something of substance to be realized by the taxpayer from the loan transaction, other than tax deductions.

We also do not find the Second Circuit's decisions in *Lee v. Commissioner* and *Goldstein v. Commissioner* to be helpful to the government. In both of those cases, the Second Circuit found that interest on the debts in question was not deductible because in each case the underlying transaction giving rise to the debt was "devoid of economic substance," and had "no prospect of realizing anything of substance other than tax benefits." *Lee*, 155 F.3d at 586, 587; *see also Goldstein*, 364 F.2d at 740 (deduction for interest paid not available for transactions "that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences").

In this case, the trial court found that there was no economic substance to the STARS Loan, because it was only a means to "camouflage" Barclays' rebate of a portion of BB&T's U.K. tax payments. Incorporating a loan component into STARS to give the entire transaction the appearance of "low cost financing" no doubt was one intended purpose of the Loan. However, unlike the sort of "contrived, ingenious, and complex" loan arrangement contemplated in *Coors*, "whose only ultimate and/or realistic purpose was to secure intended tax deduction benefits," *Coors*, 572 F.2d at 839, the structure of the STARS Loan appears straightforward. Moreover, unlike the transactions in *Lee* and *Goldstein*, there is no evidence that BB&T designed the Loan solely to claim the interest deductions. Despite the Loan's higher-than-market interest rate, it has not been shown that the transaction would result in an economic loss "regardless of what investment [BB&T] planned to use the loan proceeds for." *See Kerman*, 713 F.3d at 865.

While it may be true that the Loan operated partly to camouflage the Bx payment, it also resulted in a substantive change in BB&T's economic position. As a result of the Loan transaction, BB&T obtained unrestricted access to $1.5 billion in loan proceeds. An impact of that sort cannot be said to have resulted in no change in the economic benefits enjoyed by the taxpayer. *See Coltec*, 454 F.3d at 1355 ("[T]ransactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration."); *Kerman*, 713 F.3d at 865 (noting that the taxpayer did not have unfettered access to all the loan proceeds under the sham transaction).

Obtaining financing of that magnitude, in and of itself, would "appreciably affect" the beneficial interest of a commercial bank such as BB&T. *See ACM P'ship*, 157 F.3d at 261-62 (allowing deduction of economic losses that were "separate and distinct from the $87 million tax loss that did not correspond to any actual economic loss"); *Lee*,

155 F.3d at 586 (reciting the "undoubted proposition that interest on loans incurred to support an economically substantive investment is not disqualified as a deduction merely because the borrower is also motivated by favorable tax consequences"); *Rice's Toyota World*, 752 F.2d at 95-96 ("[I]t does not follow that the sham nature of the underlying transaction supports the Tax Court's conclusion that the recourse note debt was not genuine. . . . [A] sham transaction may contain elements whose form reflects economic substance and whose normal tax consequences may not therefore be disregarded."); *Coors*, 572 F.2d at 835 ("Since plaintiffs received insurance coverage of this magnitude during the years in issue, it is hard to accept defendant's repeated assertion that plaintiffs during those years received nothing of substance from the various policy advances or loans except a purported interest deduction.").

The evidence shows that after the failure of the original STARS transaction, which lacked a loan component, Barclays added a financing vehicle (the Loan) to the transaction in order to attract banks. Thus, entirely apart from the anticipated tax consequences, the STARS Loan had real economic utility to BB&T.

In the *Bank of New York Mellon Corp.* case, which involved a similar STARS trust and loan transaction, the Tax Court in its initial opinion did not separately address the question whether the interest on the loan component of the transaction was deductible. *Bank of N.Y. Mellon Corp.*, 140 T.C. at 15. On reconsideration, however, the court held that the interest on the loan was deductible. *Bank of N.Y. Mellon Corp. v. Comm'r*, 106 T.C.M. (CCH) 367 (2013). The court based its ruling in that case on the same factors that are present here: (1) the loan was not necessary for the STARS structure to produce the disallowed foreign tax credits; (2) the loan proceeds were not used to finance, secure, or carry out the STARS structure; and (3) the loan served a purpose beyond the creation of

tax benefits. Even though the interest rate on the loan was above the market rate, the court held that interest is deductible under section 163(a) if it accrues "on a real loan that is used for economically substantive activity . . . even if the borrower is also motivated by favorable tax consequences." *Id.* at 370. Even though the loan was overpriced, the court held that the interest was deductible because "the loan proceeds were available for use in petitioner's banking business." *Id.*

We agree with the Tax Court's analysis of the loan component of the STARS transaction. It was therefore error for the trial court to conclude that the STARS Loan had no economic substance and functioned only to camouflage the Bx payment. As in the *Bank of New York Mellon Corp.* case, the STARS Loan in this case functioned to provide financing to BB&T, which is a legitimate business purpose. Accordingly, we hold that the Loan portion of the transaction satisfies the economic substance test and that BB&T is entitled to claim interest deductions for the interest it paid on the Loan.

IV

The final issue on appeal is whether the trial court properly upheld the accuracy-related penalties imposed on BB&T. Section 6662(a) of the Internal Revenue Code provides that "[m]andatory, accuracy-related penalties apply to certain underpayments of tax that meet the statutory requirements." 26 U.S.C. § 6662(a); *Stobie Creek*, 608 F.3d at 1381. Section 6664(c) of the Code recognizes "a narrow defense" to section 6662 penalties, provided that the taxpayer can prove that it (1) had reasonable cause for the underpayment and (2) acted in good faith. 26 U.S.C. § 6664(c); *Stobie Creek*, 608 F.3d at 1381. Whether a taxpayer had reasonable cause is a question of fact reviewed for clear error. 608 F.3d at 1381. The most important factor in determining reasonable cause is "the extent of the taxpayer's effort to assess

the taxpayer's proper tax liability," judged in light of the taxpayer's "experience, knowledge, and education." *Id.*

BB&T asserts that it had reasonable cause for the underpayments because it reasonably relied on the favorable tax opinion from Sidley and received additional supportive advice from PwC.[11]   For reliance on such advice to be reasonable for purposes of section 6664(c), the taxpayer must show (1) that the advice relied on was based on "all pertinent facts and circumstances and the law as it relates to those facts and circumstances"; (2) that the advice was not based on any "unreasonable factual or legal assumptions" and did not "unreasonably rely on the representations, statements, findings or agreements of the taxpayer or any other persons"; and (3) that the taxpayer's reliance on the advice was "objectively reasonable." *Stobie Creek*, 608 F.3d at 1381.  Reliance is not reasonable if the advisor has "an inherent conflict of interest" about which the taxpayer knew or should have known; nor is it reasonable if the taxpayer knew or should have known that the transaction was "too good to be true." *Id.* at 1381-82.

The trial court found that BB&T's reliance on Sidley's tax opinion was unreasonable because Sidley had an inherent conflict of interest of which BB&T knew or should have known.  That finding is not clearly erroneous.  The evidence shows that BB&T had selected Sidley on the recommendation of KPMG, the principal marketer of STARS.  Sidley was the tax advisor in a prior STARS transaction, also marketed by KPMG.  A BB&T witness testified at trial that both KPMG and Sidley, BB&T's two principal advisors, were involved in "put[ting] [the STARS transaction] together."  In a 2001 internal memorandum

---

[11]   On appeal, BB&T no longer argues that it reasonably relied on the advice it received from KPMG, the principal marketer of STARS.

regarding Sidley's compensation package, Mr. Raymond J. Ruble—BB&T's initial tax advisor at Sidley—stated that "I intend to continue to exploit ties with KPMG . . . in connection with the development of structured tax products." In light of that evidence, the trial court did not clearly err in finding that Sidley and KPMG had a significant interest in convincing BB&T to engage in the STARS transaction and that their interest in marketing the STARS transaction rendered their advice suspect.

The evidence also supports the conclusion that BB&T knew or should have known of Sidley's conflict of interest. Sidley was recommended to BB&T by KPMG, the principal marketer of STARS. At the time of the recommendation, BB&T knew that Sidley had prepared a favorable tax opinion for a prior STARS transaction. Despite that knowledge, BB&T's witness stated that BB&T was expecting an independent opinion from Sidley because the facts and circumstances surrounding the STARS transaction offered to BB&T were different from the previous version of STARS. Yet even before BB&T formally engaged Sidley, Mr. Ruble sent BB&T a redacted copy of a tax opinion prepared for another client, which endorsed the STARS transaction. That circumstance alone should have raised a red flag that Sidley was not a truly "independent" advisor, because it was willing to endorse a transaction before it even started exploring the specific circumstances of the transaction for the client. The trial court reasonably concluded from that evidence that Sidley had an inherent conflict of interest about which BB&T knew or should have known. The trial court therefore did not clearly err in finding that BB&T's reliance on Sidley's opinion was unreasonable.

BB&T also relies on PwC's participation in the transaction to support the reasonableness of its belief in the validity of its tax position. The trial court, however, found that PwC's participation did not give BB&T a reasonable basis for believing that its tax position was sound, be-

cause PwC provided no tax opinion to BB&T. That finding is not clearly erroneous. BB&T reported only Barclays, KPMG, and Sidley as its tax advisors on the STARS transaction. It instructed PwC, its auditing firm, to focus solely on the STARS tax reserve issue and not to explore whether STARS complied with the Internal Revenue Code. PwC also explicitly informed BB&T that it "in no way [was] providing an Opinion" regarding STARS. Thus, PwC's advice to BB&T was not a tax opinion that a reasonable taxpayer would have relied on in assessing the validity of the transaction for tax purposes.

Moreover, PwC ultimately arrived at a "less than should" level of comfort that the IRS would accept the STARS transaction. Despite the qualified nature of PwC's advice, BB&T went ahead with the transaction. BB&T cannot now claim that PwC's "less than should" advice provided a reasonable basis for engaging in the STARS transaction. Therefore, the trial court did not clearly err in concluding that PwC's involvement in the STARS transaction did not provide a reasonable cause for BB&T's understatements.

BB&T's reliance on its advisors' opinions was unreasonable for the additional reason that it should have known that the STARS transaction was "too good to be true." *Stobie Creek*, 608 F.3d at 1383. BB&T's executives who had reviewed the STARS transaction were highly educated and well-versed in banking and financing transactions. The evidence shows that during the early stages of the discussions between BB&T and Barclays, BB&T's executives were extremely skeptical of the tax benefits of the STARS transaction in light of the potential downside tax risks. The trial court found that, based on its executives' education and experience, BB&T knew or should have known that claiming nearly $500 million in foreign tax credits by subjecting income to economically meaningless activities was "too good to be true." That finding is not clearly erroneous.

Finally, BB&T cites the district court opinion in *TIFD III-E Inc. v. United States*, 8 F. Supp. 3d 142 (D. Conn. 2014), for the proposition that when an area of law is uncertain, a taxpayer cannot be penalized for taking a position that could have been a reasonable interpretation of the law.  In *TIFD*, the taxpayer had initially won the case before the district court.  The Second Circuit reversed but, as the district characterized the circuit court's opinion, "openly acknowledged that the case was not a slamdunk for the government, because the relevant statute and regulations are ambiguous and subject to multiple interpretations."  *TIFD*, 8 F. Supp. 3d at 150. On remand for an assessment of penalties, the district court found that the taxpayer had a "reasonable basis" for the tax position that the court itself had initially upheld.

The court in *TIFD* held that the taxpayer's position was reasonable because the Second Circuit had explicitly acknowledged that the relevant statute and regulations bearing on the tax issue in that case were ambiguous.  We do not regard the application of the economic substance doctrine to this case to present any ambiguity.  Accordingly, we are not persuaded that BB&T's position regarding the appropriate tax treatment of the STARS transaction was reasonable.  In any event, the district court in *TIFD* was not construing the "reasonable cause" and "good faith" exception of section 6664(c), but instead the "reasonable basis" provision of section 6662(d)(2)(B)(ii) which, as the court explained, is more easily satisfied.  *See* 8 F. Supp. 3d at 151.

We conclude that the trial court did not err in imposing accuracy-related penalties on BB&T.  The amount of the penalties, however, requires reassessment, as we have found that BB&T is entitled to claim interest deductions for the interest it paid on the STARS Loan.  In light of our decision regarding the interest deductions, there may be other necessary adjustments in the judgment as well, which we leave to the trial court on remand.

Each party shall bear its own costs for this appeal.

**AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED**