# United States Court of Appeals
# for the Federal Circuit

———————————

**ALTERNATIVE CARBON RESOURCES, LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2018-1948

———————————

Appeal from the United States Court of Federal Claims in No. 1:15-cv-00155-MMS, Chief Judge Margaret M. Sweeney.

———————————

Decided:  September 26, 2019

———————————

VIVIAN D. HOARD, Taylor English Duma LLP, Atlanta, GA, argued for plaintiff-appellant.  Also represented by BRIAN GARDNER, KELLY MULLALLY; WILLIAM SIDNEY SMITH, Smith & Kramer, PC, Des Moines, IA.

CLINT CARPENTER, Tax Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by TERESA E. MCLAUGHLIN, RICHARD E. ZUCKERMAN.

———————————

Before O'MALLEY, REYNA, and CHEN, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

Appellant Alternative Carbon Resources, LLC claimed nearly $20 million in energy tax credits meant for taxpayers who sell alternative fuel mixtures. The Internal Revenue Service ("IRS") later determined that Alternative Carbon should not have claimed these credits and it demanded repayment (along with interest and penalties). Alternative Carbon paid back the government, in part, and then filed this refund suit in the United States Court of Federal Claims ("Claims Court").

After the parties filed cross-motions for summary judgment, the Claims Court decided that Alternative Carbon failed to establish that it properly claimed the credits or that it had reasonable cause to do so. *Alternative Carbon Res., LLC v. United States*, 137 Fed. Cl. 1 (2018). The Claims Court therefore granted summary judgment for the government.

Alternative Carbon appeals, arguing that it is entitled to claim the credits or that it at least had reasonable cause for claiming them and so it should not have to pay any penalties. Because we conclude that Alternative Carbon cannot show it is entitled to the credits or that it had reasonable cause for claiming them, we affirm.

I. BACKGROUND

A. Alternative Fuel Mixture Credits

We begin with a brief overview of the tax credits that Alternative Carbon claimed. Section 6426(e) allows taxpayers to obtain a credit for "producing any alternative fuel mixture for sale or use in a trade or business of the taxpayer." 26 U.S.C. § 6426(e)(1). The statute then defines an "alternative fuel mixture" as "a mixture of alternative fuel and taxable fuel" that is either "sold by the taxpayer . . . for use as fuel" or "used as a fuel by the taxpayer producing such mixture." *Id.* at § 6426(e)(2)(A)–(B).

As is typical in tax law, this definition of alternative fuel mixture incorporates other parts of the Internal Revenue Code by reference. For example, the statute relies on subsections (A), (B), and (C) of § 4083(a)(1) to supply a definition for "taxable fuel." *See id.* As relevant here, that definition includes "diesel fuel." *Id.* at § 4083(a)(1)(B). The statute also defines "alternative fuel" based on a list of examples that includes "liquid fuel derived from biomass (as defined in section 45K(c)(3))." *Id.* at § 6426(d)(2)(G); *see also id.* at § 45K(c)(3) (broadly defining biomass as "any organic material" besides oil, natural gas, and coal). The statute does not, however, define what it means for a mixture to be "sold by the taxpayer." *Id.* at § 6426(e)(2)(A).

In 2006, the IRS issued a "notice" regarding § 6426. *See* I.R.S. Notice 2006-92, 2006-2 C. B. 774. Among other things, the IRS interpreted alternative fuel mixture to "mean[] a mixture of alternative fuel and taxable fuel that contains at least 0.1 percent (by volume) of taxable fuel (as defined in § 4083(a)(1))." *Id.* at § 2(b). It also explained that "[a] mixture producer sells a mixture *for use as a fuel* if the producer has reason to believe that the mixture will be used as a fuel." *Id.* § 2(f)(2). The notice does not address what it means for an alternative fuel mixture to be sold in the first place.

To put all of this in plain English, a taxpayer can claim the alternative fuel mixture credit under § 6426 by selling a mixture of alternative fuel, *e.g.*, liquid fuel derived from biomass, and taxable fuel, *e.g.*, diesel fuel, so long as the mixture is ultimately sold for use as fuel.[1] The issues in

---

[1] Section 6426(a) also provides that "[n]o credit shall be allowed in the case of the credits described in subsections (d) and (e) unless the taxpayer is registered under section 4101." 26 U.S.C. § 6426(a). There is no dispute that Alternative Carbon satisfied this condition. *See Alternative Carbon*, 137 Fed. Cl. at 22.

this appeal are, thus, whether the taxpayer actually sold the fuel mixture here and, if so, whether any such sale was "for use as fuel."

## B. Alternative Carbon's Business

Alternative Carbon argues that it is entitled to claim this alternative fuel mixture credit because it sold an alternative fuel mixture to third parties who, in turn, used the mixture as fuel in anaerobic digestion tanks. Before addressing this argument, we briefly discuss anaerobic digestion and Alternative Carbon's business model. *See also Alternative Carbon*, 137 Fed. Cl. at 7–12, 16–19.

Some microorganisms produce methane when they digest organic matter. The input for this process of anaerobic digestion, *i.e.*, the organic material that the microorganisms digest, consists of organic solids called feedstock mixed in a sludge with water.[2] *Id.* at 8; *see also* J.A. 550 ("[The] microbes basically eat the organics, and a by-product of that is methane gas."). Anaerobic digester tanks provide a place for the microorganisms to digest the feedstock. J.A. 872–73. Entities that operate these digester tanks then use the resulting methane to generate electricity (among other things). *See, e.g.*, J.A. 552.

Alternative Carbon began operating in 2011. Its business generally involved a few basic steps. First, Alternative Carbon bought feedstock from ethanol production plants. Next, it paid a trucking company to transport the feedstock. Along the way, the trucking company added diesel fuel to the feedstock. The trucking company then delivered this feedstock/diesel mixture to entities that operated

---

[2]      These organic solids are also sometimes called substrates. For clarity, and consistent with the Claims Court, we will use the term "feedstock" throughout this opinion to describe these organic materials. *Alternative Carbon*, 137 Fed. Cl. at 8 n.6.

anaerobic digestion tanks.[3]   The digester operators ultimately fed the mixture to methane-producing microorganisms.  Each step is discussed in more detail below.

When Alternative Carbon purchased feedstock from its suppliers, the feedstock consisted of organic material that might otherwise be considered waste.  For example, the process of distilling ethanol produces water and corn solids ("stillage") as a by-product.  J.A. 1718.  This solid stillage is then further distilled through a centrifuge to separate liquid ("thin-stillage") from other solids.  *Id.*  Alternative Carbon paid ethanol producers to acquire this thin-stillage.  *Id.*  In addition to thin-stillage, Alternative Carbon used other organic materials as feedstock.  J.A. 1718–20.

After purchasing the feedstock, Alternative Carbon paid a trucking company to mix enough diesel fuel with the feedstock so that the resulting mixture could qualify as an alternative fuel mixture under § 6426.  *Alternative Carbon*, 137 Fed. Cl. at 9; *see also* J.A. 814 ("[Y]ou got to put a splash of diesel fuel in it, and here's why . . . it has a splash of diesel fuel in it before so we can generate tax credits.").  Alternative Carbon's expert conceded that adding the diesel fuel "did not measurably change the methane production" of the microorganisms.  J.A. 616; *see also* J.A. 1026 ("Q. And, in fact, you wouldn't recommend putting diesel in an anaerobic digester [tank]; is that right?  A. Typically, no.  I wouldn't recommend it.").

Having made the feedstock/diesel mixture, the trucking company delivered the mixture to digester operators.  Alternative Carbon paid a fee to the operators based on how much feedstock/diesel mixture they accepted.  *See, e.g.*, J.A. 794.  In Alternative Carbon's contract with the Des Moines Wastewater Reclamation Authority

---

[3]   For clarity, we will refer to these entities collectively as digester operators.

("WRA"), this "disposal fee" was "$0.02634 per delivered gallon" plus applicable taxes. *Id.* In its contract with Amana Farms, the "handling fee" was twenty-five dollars per ton. J.A. 1054. There are no contracts between Alternative Carbon and other digester operators in the record.

Digester operators like WRA and Amana Farms also paid an annual fixed fee to Alternative Carbon. *See* J.A. 795; J.A. 1054. But the fees Alternative Carbon paid digester operators far surpassed the annual fees it collected from them. *Alternative Carbon*, 137 Fed. Cl. at 18 ("Throughout 2011, plaintiff received $8,950.00 of income for the purchase of its alternative fuel mixtures and paid its customers a total of $1,678,029.07 in 'disposal fees.'"). There is also no evidence in the record that the fees paid by WRA or Amana were based on the value of the feedstock/diesel mixture. *See, e.g.*, Oral Arg. at 2:24–40 ("Q. And what do you say the value of the goods transferred was? A. The value of . . . the goods transferred to the digester companies is not quantified in the record . . . ."), http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2018-1948.mp3; J.A. 861 ("This is for their tax credit stuff. A once a year charge of $950 for us to 'buy' product (AD feedstock).").

Once the feedstock/diesel mixture was delivered, it was fed into digester tanks along with other feedstocks. *See, e.g.*, J.A. 878–79. Some of the resulting methane was flared, *i.e.*, burned off as excess, and some was used to generate electricity. *Alternative Carbon*, 137 Fed. Cl. at 8; J.A. 1475.

## C. Alternative Carbon's Tax Planning

From the outset, Alternative Carbon and its business plan were designed in view of the alternative fuel mixture tax credit. For example, James Huyser, one of Alternative Carbon's founders, testified:

> We understood that if the tax credits . . . w[ere] going to be approved in 2011, we needed to have a vehicle whereby we could have a company that we could operate through that would be able to purchase waste products, transport waste products, and sell waste products as fuel for anaerobic digesters. And so there needed to be some sort of company structure in order to do all this and also be considered an entity for the tax credits that were a part of our business plan.

J.A. 851; *see also* J.A. 527–28.

To ensure that Alternative Carbon could obtain the credits, its founders consulted with a tax attorney named Greg Sanderson. Initially, Sanderson sent them information about energy tax credits and advised them to register their company with the IRS. *See, e.g.*, J.A. 528–29. Partners at Alternative Carbon also reached out to Sanderson with specific questions about their business.

On January 21, 2011, Huyser emailed Sanderson about an agreement between Alternative Carbon and WRA that was signed the same day. J.A. 1083; *see also* J.A. 794. The agreement stated that WRA would charge a "disposal fee" for accepting the feedstock/diesel mixture, but it did not mention any money flowing from WRA to Alternative Carbon. J.A. 794. In his email, Huyser asked Sanderson whether the transaction between Alternative Carbon and WRA, in which Alternative Carbon paid WRA to accept the feedstock/diesel mixture, counted as a sale of the mixture for purposes of obtaining the tax credits. J.A. 1083 ("We are basing [the] 'sale' and its consideration on the service provided by the WRA in disposing of the 'non-combustible' materials."). Sanderson replied that Alternative Carbon would have "a better case if you charge the user of the mixture for the fuel value, and they charge you a disposal fee." J.A. 1082. But Sanderson added that he "d[id] not have a full understanding of the economics" of

Alternative Carbon's business. *Id.* For example, Sanderson asked "[h]ow do you make money from this business if you pay the digester company to take the liquid" and "[d]oes this business cash flow without the 50 cent per gallon credit?" *Id.* He also cautioned that while "[t]wo private letter rulings [from the IRS] indicate that the IRS may consider the transfer as a 'sale' even if you do not receive payment for the fuel . . . [these private letter rulings] may not be technically cited as precedent by other taxpayers." *Id.*

In June 2011, Alternative Carbon received a questionnaire from the IRS asking for additional information about its business. J.A. 1522–33; *see also* J.A. 399. Huyser drafted an initial response and then sent it to Sanderson. J.A. 1522. Sanderson replied with several comments and questions. For example, Sanderson asked:

> Which credit are you trying to claim: the mixture credit for liquid biomass and diesel[] or compressed liquified biogas? I do not think you qualify for the compressed liquified biogas credit because you are not the producer (i.e. owner of the gas and all ingredients). Does the digester company claim a credit? If so there may be a problem of double-dipping.

J.A. 1525 (capitalization altered).

On July 12, 2011, the IRS issued an advisory letter stating that alternative fuel mixtures used in anaerobic digester tanks are not "used as a fuel" under § 6426. *See* I.R.S. Chief Counsel Advisory, IRS CCA 201133010, 2011 WL 3636293 (July 12, 2011). After this advisory letter issued, Sanderson asked the IRS whether Alternative Carbon should stop claiming the tax credit for selling an alternative fuel mixture to digester operators. J.A. 1286. According to Sanderson, an IRS agent told him that Alternative Carbon should continue to claim the credits so long as its registration was not revoked. J.A. 1286–87.

Sanderson therefore told Alternative Carbon that it should continue to claim the credits.  J.A. 401.

Ultimately, Alternative Carbon claimed $19,773,393 in alternative fuel mixture credits for 2011.  *Alternative Carbon*, 137 Fed. Cl. at 19.  On March 12, 2012, however, the IRS began an initial audit of Alternative Carbon.  *Id.*  The IRS eventually determined that Alternative Carbon was not entitled to the alternative fuel mixture credits and so it assessed the full value of the credits along with "excessive claim penalties."[4]  *Id.* at 19–20.

### D.  The Claims Court's Decision

Alternative Carbon sent partial payments to the IRS followed by requests for refunds.  *Id.* at 20.  When the IRS did not respond to these requests, Alternative Carbon filed suit in the Claims Court.  *Id.*  The government counterclaimed for the full amount of taxes and penalties owed.  *Id.* at 21.

After discovery, the parties filed cross motions for summary judgment.  *Id.*  In its motion, the government argued that Alternative Carbon was not entitled to the alternative fuel mixture credit because (1) the feedstock/diesel mixture was not an alternative fuel, (2) the mixture was not sold, and (3) to the extent it was sold, it was not sold for use as fuel.  The government also argued that (4) Alternative Carbon had no reasonable cause for claiming the credits and thus the assessed penalties were appropriate.  The Claims Court addressed each argument.

---

[4]    The IRS assessed other penalties, but they are not at issue in this appeal.  *See Alternative Carbon*, 137 Fed. Cl. at 37.

### 1. Whether the mixture is an alternative fuel mixture

As noted above, § 6426 defines an alternative fuel to include liquid fuel derived from biomass. The government argued below—but does not maintain on appeal—that the feedstock/diesel mixture was not a "liquid fuel" because it contained "solid fuel dissolved or suspended in water." J.A. 648; *see also Alternative Carbon*, 137 Fed. Cl. at 23–24. The Claims Court rejected this argument, however, explaining that "a mixture comprised of water and dissolved or suspended solids is clearly a 'liquid' in layman's terms." *Alternative Carbon*, 137 Fed. Cl. at 24. It therefore reasoned that fuel dissolved or suspended in water was "liquid fuel," too. *Id.*

### 2. Whether the mixture was *sold*

Section 6426's definition of alternative fuel mixture also requires the mixture to be "sold by the taxpayer." 26 U.S.C. § 6426(e)(2)(A). The government argued that Alternative Carbon's feedstock/diesel mixture did not clear this threshold because Alternative Carbon did not *sell* the feedstock/diesel mixture. Instead, the government argued that Alternative Carbon *bought* disposal services from WRA and Amana. The Claims Court agreed.

With respect to the annual fee Alternative Carbon collected from digester operators, the Claims Court concluded that the fee "lacked economic substance because those nominal amounts were collected solely for the purpose of receiving tax credits." *Alternative Carbon*, 137 Fed. Cl. at 28. To support this view, the Claims Court pointed to emails from WRA showing that the $950 fee it paid to Alternative Carbon "was intentionally offset by a $950 administrative fee that the WRA charged so that the sale price and fee would be 'a wash.'" *Id.* ("[T]he parties intended for there to be no substantive sale price—they simply engaged in 'a contrived transaction performing no economic or business function other than to generate tax

benefits.'"). This showed that "the 'sales' price did not have an independent business purpose and only served to qualify the transactions as sales for purposes of the alternative fuel mixture credit." *Id.* The Claims Court also emphasized that Alternative Carbon determined how much mixture would be transferred, charged a flat fee, and did not collect or pay sales tax. *Id.*

In addition to the annual fee, Alternative Carbon argued that valuable consideration was exchanged in these transactions because it provided the feedstock/diesel mixture and various fees in exchange for "being relieved of its obligation to dispose of the by-products remaining at the conclusion of the anaerobic digestion process." *Id.* at 28–29 (internal quotation marks omitted). The Claims Court reasoned, however, that this was "a separate bargain from plaintiff's receipt of money in exchange for the alternative fuel mixtures it delivered." *Id.* at 30. Thus, even if this exchange "was a bona fide transaction," the purported sale of the feedstock/diesel mixture was not. *Id.* The Claims Court therefore concluded that Alternative Carbon was not entitled to claim the credits because it did not sell the feedstock/diesel mixture. *Id.* at 31.

### 3.  Whether the mixture was sold *for use as fuel*

In addition to arguing that Alternative Carbon did not sell the feedstock/diesel mixture, the government also argued that the mixture was not sold "for use as fuel" because it is not a "fuel." *Id.* at 24–26. The government also argued that even if *some* feedstock could be used as a fuel, Alternative Carbon had no evidence that *its* feedstock was used to produce energy. *Id.* at 26.

The Claims Court rejected the government's first argument, but it agreed that Alternative Carbon could not prove that its feedstock was used as a fuel. The Claims Court thus required Alternative Carbon to show that *its* feedstock—among all the other feedstocks input into the digester tanks—produced methane that was actually used

to produce energy. *Id.* Because Alternative Carbon could not do so, the Claims Court concluded that it was not entitled to the tax credits. *Id.*

### 4. Whether Alternative Carbon should pay penalties

A taxpayer who wrongly claims the energy credits defined in § 6426 may be assessed additional penalties. 26 U.S.C. § 6675(a). A taxpayer can avoid these penalties by demonstrating that it had "reasonable cause" to claim the credits. *Id.* While "reasonable cause" is not defined in the statute, the Claims Court looked to other areas of tax law to conclude that reasonable cause should turn on "'the extent of the taxpayer's effort to assess the taxpayer's proper tax liability,' judged in light of the taxpayer's 'experience, knowledge, and education.'" *Alternative Carbon*, 137 Fed. Cl. at 31 (quoting *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1381 (Fed. Cir. 2010)).

Applying this standard, the Claims Court concluded that Alternative Carbon had no reasonable cause for claiming the credits. *Id.* at 34, 37. In particular, the Claims Court emphasized that because Sanderson repeatedly qualified his advice based on not understanding the economics or science behind Alternative Carbon's business it was unreasonable for Alternative Carbon to rely on him. *Id.* at 34. To the extent it would have been reasonable to rely on Sanderson, the Claims Court added that Alternative Carbon also "ignored" Sanderson's advice. *Id.*

Alternative Carbon also argued that it reasonably relied on guidance from IRS agents, IRS private letter rulings, and the IRS's decision to accept Alternative Carbon's initial registration for the credits. *Id.* at 32, 35. The Claims Court, however, concluded that nothing the IRS did constituted advice that Alternative Carbon could have reasonably relied on. *Id.* For example, while Sanderson spoke with IRS agents about Alternative Carbon's decision to claim the credits, none of them provided any

written guidance to Sanderson or Alternative Carbon. *See, e.g.*, *id.* at 32–33. As to the private letter rulings, the Claims Court noted that these rulings "by their own terms" say they "may not be used or cited as precedent" by other taxpayers. *Id.* at 29 n.25.

Accordingly, the Claims Court granted summary judgment for the government. Appellant Alternative Carbon timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

Summary judgment should be denied unless, drawing all justifiable inferences in the non-movant's favor, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Cl. R. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "We review the Claims Court's grant of summary judgment *de novo.*" *Amergen Energy Co., ex rel. Exelon Generation Co. v. United States*, 779 F.3d 1368, 1372 (Fed. Cir. 2015). That means to prevail on appeal, "the non-movant need only show that one or more of the facts on which the [Claims Court] relied was 'genuinely in dispute,' as that phrase is interpreted in *Anderson*, and was material to the judgment." *Amini Innovation Corp. v. Anthony California, Inc.*, 439 F.3d 1365, 1368 (Fed. Cir. 2006). Where the non-movant bears the ultimate burden of proof, however, "[a] nonmoving party's failure of proof concerning the existence of an element essential to its case on which [it] will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Alternative Carbon argues on appeal that it properly claimed the alternative fuel mixture credits and, in the

alternative, that it at least had a reasonable basis to do so. We address both arguments below.

## A.  Claiming the Tax Credits

Alternative Carbon bears the ultimate burden of proving it properly claimed the alternative fuel mixture credits. *WMI Holdings Corp. v. United States*, 891 F.3d 1016, 1021–22 (Fed. Cir. 2018).  The government can therefore discharge its burden on summary judgment by establishing that Alternative Carbon failed to show it is entitled to the fuel credits as a matter of law.  *Dairyland*, 16 F.3d at 1202.

Alternative Carbon insists that it is entitled to the credits because it transferred property, *i.e.*, the disposal fee and the feedstock/diesel mixture, to customers in exchange for consideration, "an annual fee and relief from the obligation to dispose of the [alternative fuel mixture] and waste created by the [alternative fuel mixture]."  Appellant's Br. at 32.  According to Alternative Carbon, this shows that it "sold" its alternative fuel mixture "for use as fuel" under § 6426.  The government maintains, however, that in each of these transactions Alternative Carbon was *buying* disposal services and not *selling* alternative fuel mixtures as required by § 6426.  Appellee's Br. at 30.  We agree with the government.

As explained above, taxpayers may claim a credit under § 6426(e) for "producing any alternative fuel mixture for sale or use in a trade or business of the taxpayer." 26 U.S.C. § 6426(e)(1).  An "alternative fuel mixture" is defined as "a mixture of alternative fuel and taxable fuel" that is either "sold by the taxpayer . . . for use as fuel" or "used as a fuel by the taxpayer producing such mixture." *Id.* at § 6426(e)(2).  And while many of these terms, including alternative fuel and taxable fuel, incorporate definitions from within § 6426 or the Internal Revenue Code, the statute offers no specific definition of what it means for an alternative fuel mixture to be "sold by the taxpayer."

The IRS generally defines a "sale" as "an agreement whereby the seller transfers the property (that is, the title or the substantial incidents of ownership) in goods to the buyer for a consideration called the price, which may consist of money, services, or other things." 26 C.F.R. § 48.0-2(a)(5). The parties agree that this definition applies here.

Alternative Carbon insists that its transactions with digester operators were sales because it transferred property, *i.e.*, the disposal fee and its feedstock/diesel mixture, to customers in exchange for consideration, *i.e.*, "an annual fee and relief from the obligation to dispose of the [alternative fuel mixture] and waste created by the [alternative fuel mixture]." Appellant's Br. at 32. But the only aspect of this transaction that arguably distinguishes it from a situation where Alternative Carbon was buying disposal services is the annual fee digester operators paid to Alternative Carbon. And yet, Alternative Carbon offered no evidence that this fee reflected the price or value of the feedstock/diesel mixture. Oral Arg. at 2:32–40 ("The value of the goods transferred to the digester companies is not quantified in the record . . . ."). Without more, there is no evidence that the digester operators paid anything that genuinely can be characterized as consideration in order to obtain the feedstock/diesel mixture.[5]

---

[5] Alternative Carbon argues that a sale can occur even if no price is paid by either party to the transaction. Appellant's Br. at 42 (citing *Basque Station, Inc. v. United States*, 53 F. App'x 829 (9th Cir. 2002)). Not only is *Basque* a non-precedential opinion from a different circuit, it is inapposite. 53 F. App'x at 831 (noting that the transporter "received compensation for the portion of fuel Transport retained"). *Basque* simply says that a buyer/seller relationship may emerge between two parties based on economic realities even if they are not directly exchanging goods with each other. *Id.* at 830–31 ("Although Basque and

Even if this fee might be technically characterized as a price, or as meaningful consideration, it lacked economic substance and should be disregarded. *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352 (Fed. Cir. 2006) ("[T]he economic substance doctrine has required disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality."); *see also Feldman v. Comm'r*, 779 F.3d 448, 457 (7th Cir. 2015) (disregarding one part of a transaction because it lacked economic substance). This doctrine "ensure[s] that tax benefits are available only if 'there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels.'" *Salem Fin., Inc. v. United States*, 786 F.3d 932, 949 (Fed. Cir. 2015) (quoting *Frank Lyon Co. v. United States*, 435 U.S. 561, 583–84 (1978)).

The economic substance doctrine, once "a judicial tool for effectuating . . . Congressional purpose," *Coltec*, 454 F.3d at 1354, has been codified at 26 U.S.C. § 7701(o):

(1) In the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if—

(A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and

---

Transport may not have intended to be in a buyer/seller relationship, their intent does not change the legal substance of the transaction."). It does not suggest that an exchange without any meaningful consideration is a sale.

>   (B) the taxpayer has a substantial purpose
>   (apart from Federal income tax effects) for en-
>   tering into such transaction.

26 U.S.C. § 7701(o)(1)(A)–(B).

Against this backdrop, we agree with the Claims Court that Alternative Carbon offered no evidence suggesting the annual fee meaningfully changed its economic position or had any non-tax purpose whatsoever. *See Stobie Creek*, 608 F.3d at 1375 ("[W]e review the trial court's application of the economic substance doctrine without deference."). Indeed, the record compels the opposite conclusion. For example, the annual fees Alternative Carbon collected were nominal—$8,950—compared to the millions it paid in fees. *Alternative Carbon*, 137 Fed. Cl. at 28; *see also Feldman*, 779 F.3d at 457 ("Remove the Shapiro loan from this transaction and nothing of consequence changes.").

Alternative Carbon's negotiations with WRA also show that the annual fee was added for tax purposes. In fact, Alternative Carbon's original contract with WRA initially referenced only a "disposal fee" paid by Alternative Carbon to WRA. J.A. 794. In an email to Sanderson sent the day this agreement was signed, Huyser explained that Alternative Carbon was relying on this disposal fee to establish that a sale occurred between Alternative Carbon and WRA. J.A. 1083. He added that he "did not feel comfortable with the back and forth payments to the [WRA] and [Alternative Carbon]." *Id.* But Sanderson told Huyser that Alternative Carbon would have a "better case" for claiming the credits if it "charge[d] the user of the mixture for the fuel value." J.A. 1082. After this email, WRA and Alternative Carbon agreed to add an annual fee to the agreement. J.A. 795; *see also Coltec*, 454 F.3d at 1355 (suggesting the economic substance doctrine would "also apply if the taxpayer's sole subjective motivation is tax avoidance"). Even when the fee was added, Larry Hare—who signed the agreement on behalf of WRA—characterized it as "[a] once a year charge"

that was "for [Alternative Carbon's] tax stuff" and offset by "admin fees" that WRA charged right back to Alternative Carbon.  J.A. 861 ("We turn around and charge them $950 for admin fees, so it is a wash.").[6]

Alternative Carbon argues that applying the economic substance doctrine here punishes it for not being profitable. But Alternative Carbon offered no evidence it ever "reasonably expected" to generate any profit apart from the tax credits.   26 U.S.C. § 7701(o)(2)(A).   At most, Alternative Carbon argues on appeal that it could have been profitable without the credits "if the city of Des Moines had converted its vehicles to compressed natural gas sooner."  Appellant's Br. 46.  The only source for this attorney argument, however, is speculation by a partner at Alternative Carbon about "[p]rojections . . . that the company would be profitable without any tax credits if this alternative use was implemented" because it might spur demand for methane. J.A. 531.  But Alternative Carbon did not identify these projections—or any other support for this claim—in the record.  Pure speculation that Alternative Carbon might someday generate a pre-tax profit is not enough to defeat summary judgment here.  *See Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 164 (Fed. Cir. 1985) ("[M]ere allegations by declaration or otherwise do not raise issues of fact needed to defeat a motion for summary

---

[6]      Alternative Carbon argues that this "single email from a mid-level employee of one of ACR's fourteen customers, who appears to possess no personal knowledge of the entire transaction[]" is either hearsay or irrelevant.  Appellant's Reply at 9.  We disagree.  The email was sent by the WRA employee who signed the agreement with Alternative Carbon and it discusses why the $950 fee was added with another WRA employee.  That discussion is consistent with emails from Huyser and Sanderson.  The email is also not hearsay in this context.

judgment."); *Blum v. Comm'r*, 737 F.3d 1303, 1312 (10th Cir. 2013) ("The probability of earning a profit must be reasonable, not a mere possibility." (citing *Stobie Creek*, 608 F.3d at 1376)).

Alternative Carbon also argues that the economic substance doctrine does not apply in this case. Appellant's Br. 32 ("Congress specifically intended that alternative energy tax incentives be excluded from the economic substance doctrine."). To support this claim, Alternative Carbon relies on a report by the Joint Committee on Taxation "cit[ing] alternative energy tax credits, new markets credits, low income housing credits, and rehabilitation credits as types of tax incentives that may not be disallowed for lack of pre-tax profits." *Id.* at 44–45 (citing Staff of Joint Comm. on Taxation, 111th Cong., *Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as Amended, in Combination with the "Patient Protection and Affordable Care Act"* at 152 n.344 (Comm. Print 2010)). This argument is meritless. First, a committee report cannot overcome clear statutory text. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material."). The language on which Alternative Carbon relies, from a footnote in a committee report, also does not support its argument. The report says that taxpayers should be allowed to claim credits if they engage in transactions that, "in form and substance," are "the type of activity that the credit was intended to encourage." Staff of Joint Comm. on Taxation, 111th Cong., *Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as Amended, in Combination with the "Patient Protection and Affordable Care Act"* at 152 n.344 (Comm. Print 2010)). This falls far short of instructing courts to ignore the economic substance doctrine just because the taxpayer is trying to claim an energy tax credit. *Cf. Salem*, 786 F.3d at 941 ("The economic substance doctrine thus

applies even to a transaction that is governed by a statute or regulation that itself contains a 'substance-over-form' provision.").

Alternative Carbon's other argument for ignoring the economic substance doctrine fares no better. According to Alternative Carbon, § 7701(o) applies only "[i]n the case of any transaction to which the economic substance doctrine is relevant." 26 U.S.C. § 7701(o)(1). Alternative Carbon insists that this is not such a case because it is claiming energy credits. But if a taxpayer engages in a transaction that is otherwise unprofitable in order to collect tax credits "that situation demands careful review" under the economic substance doctrine. *Salem*, 786 F.3d at 950. The economic substance doctrine is therefore indisputably relevant here and nothing in the text of § 7701(o)(1) suggests otherwise. Indeed, the statute declares that "[t]he determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted." 26 U.S.C. § 7701(o)(5)(C).

Alternative Carbon also points to *Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995). There, the Tax Court treated a leaseback transaction involving solar water heaters as a sham transaction because the taxpayer's estimated pre-tax income was negative. *Sacks*, 69 F.3d at 990. The Ninth Circuit reversed, explaining that the "investment did not become a sham just because its profitability was based on after-tax instead of pre-tax projections." *Id.* at 991. In particular, the Ninth Circuit concluded that the "[a]bsence of pre-tax profitability does not show whether the transaction ha[s] economic substance beyond the creation of tax benefits where Congress has purposely used tax incentives to change investors' conduct." *Id.* (internal quotation marks and citations omitted). But the taxpayer in *Sacks* provided evidence about how he could eventually make money through his water heater leaseback program. *Id.* ("If energy prices rise faster than the price of solar

water heaters fall, Mr. Sacks stands to make more money. After 53 months, when the units are still well within Amcor's warranty period and their useful life by any measure, Mr. Sacks owns them free and clear and can negotiate whatever deal the market will bear."). Alternative Carbon, by contrast, did not. Instead, it entered into unprofitable transactions while charging digester operators a nominal fee so it could generate tax credits.

Alternative Carbon's reliance on *Salem* provides no help either. In that case, we acknowledged that "Congress often provides tax benefits to encourage socially beneficial activity that would not be pursued absent tax advantages." *Salem*, 786 F.3d at 950. And yet, we also emphasized that even this activity "demands careful review" if it involves transactions that are unprofitable absent a tax credit. *Id.* This review "requires an inquiry into whether the transaction meaningfully alters the taxpayer's economic position (other than with regard to the tax consequences) and whether the transaction has a bona fide business purpose." *Id.* With respect to Alternative Carbon's decision to charge digester operators an annual fee, the answer is clearly no. As explained above, the annual fee was nominal and there is no evidence it had "a bona fide business purpose." *Id.*

Alternative Carbon maintains that, even without the annual fee, it still sold the feedstock/diesel mixture. According to Alternative Carbon, this is so because the mixture was transferred as part of a transaction where it *gave* the mixture and a disposal fee to the digester operators in exchange for *getting* relief from its obligation to dispose of the feedstock/diesel mixture and associated waste. Appellant's Br. 51. We are not convinced. The digester operators accepted the mixture because they were paid to do so. It would defy the statute's obvious meaning to conclude that Alternative Carbon *sold* the mixture to these digester operators by *buying* disposal services from them. 26 U.S.C. § 6426(e)(2) ("[T]he term 'alternative fuel mixture' means a mixture . . . which . . . is sold by the taxpayer

producing such mixture to any person for use as fuel . . . ."). Such a transaction is clearly not the sort of transaction that Congress contemplated in § 6426(e).  *Cf. Coltec*, 454 F.3d at 1355–56 ("'[A] taxpayer carr[ies] an unusually heavy burden when he attempts to demonstrate that Congress intended to give favorable tax treatment to the kind of transaction that would never occur absent the motive of tax avoidance.'" (quoting *Rothschild v. United States*, 407 F.2d 404, 411 (Ct. Cl. 1969))).

Alternative Carbon's contrary argument relies on two private letter rulings from the IRS in the context of a similar tax credit related to alcohol-based fuels.  Appellant's Br. 49 (citing I.R.S. Priv. Ltr. Rul. 9631012 (Aug. 2, 1996); I.R.S. Priv. Ltr. Rul. 9229038 (July 17, 1992)).  In both of these cases, the taxpayer transferred a mixture that included alcohol to entities that "dispose[d] of the [mixture] by using it as a fuel."  I.R.S. Priv. Ltr. Rul. 9229038 (July 17, 1992).  The IRS concluded that this transfer was a "sale" because the taxpayer—who transferred the mixture for disposal—was "relieved from the duty associated with having to dispose of the [mixture]."  *Id.*  But these private letter rulings have no precedential weight.  *See, e.g.*, *id.* ("This ruling is directed only to the taxpayer who requested it.  Section 6110([k])(3) of the Code provides that it may not be used or cited as precedent.").  The rulings also arose in a completely different context where the taxpayer had a legitimate non-tax purpose for acquiring the waste and for paying someone to take it.  *Id.*

Ultimately, Alternative Carbon did not offer evidence raising a genuine dispute about whether it sold the feedstock/diesel mixture to the digester operators.  Accordingly,

we agree with the Claims Court that the government was entitled to summary judgment.[7]

## B. Penalties

A taxpayer who wrongly claims a credit under § 6426 may be liable for up to 200% of the "excessive amount" claimed unless they show that "the claim for such excessive amount is due to reasonable cause." 26 U.S.C. § 6675(a). Alternative Carbon bears the ultimate burden of showing that it had reasonable cause for claiming the alternative fuel mixture credits. *Stobie Creek*, 608 F.3d at 1381. "[W]hether the elements that constitute reasonable cause are *present* in a given situation is a question of fact, but what elements *must* be present to constitute reasonable cause is a question of law." *Russian Recovery Fund Ltd. v. United States*, 851 F.3d 1253, 1259 (Fed. Cir. 2017) (quoting *United States v. Boyle*, 469 U.S. 241, 249 n.8 (1985)).

Section 6675 does not define "reasonable cause," but Alternative Carbon argues that § 6664's general definition of reasonable cause in the context of underpayments provides a useful starting point. *Cf. Estate of Liftin v. United States*, 754 F.3d 975, 980 (Fed. Cir. 2014) ("In applying the 'reasonable cause' provision of section 6651(a)(1) to the claimed reliance on legal advice here, we think it appropriate to borrow the relevant component of the IRS's formal regulatory implementation of 'reasonable cause' in the closely analogous setting of section 6664(c)(1)."). We agree.

We have emphasized that determining whether reasonable cause exists depends on "all the pertinent facts and circumstances." *Stobie Creek*, 608 F.3d at 1381 (citing Treas. Reg. § 1.6664–4(b)(1)). But "[t]he most

---

[7] Because we agree that Alternative Carbon did not sell the feedstock/diesel mixture, we do not reach questions of whether, assuming a sale occurred, the sale was "for use as fuel." *See* Oral Arg. 1:22–31.

important . . . factor[] is 'the extent of the taxpayer's effort to assess the taxpayer's proper tax liability,' judged in light of the taxpayer's 'experience, knowledge, and education.'" *Id.* (quoting Treas. Reg. § 1.6664–4(b)(1)). When this effort includes obtaining advice from a tax professional, we have said that expert advice can only provide reasonable cause if it meets several requirements. *Id.* First, the advice itself must be "based on all pertinent facts and circumstances and the law as it relates to those facts and circumstances." *Id.* (internal quotation marks omitted). "Second, the advice relied upon must not be based on any 'unreasonable factual or legal assumptions,'" including unreasonable representations by third parties. *Id.* "Third, the taxpayer's reliance on the advice must itself be *objectively* reasonable." *Id.* (emphasis in original). In particular, it is not reasonable for a taxpayer to rely on advice if the taxpayer "knew or should have known that the transaction was 'too good to be true,' based on all the circumstances, including the taxpayer's education, sophistication, business experience, and purposes for entering into the transaction." *Id.* at 1382.

Alternative Carbon argues that "Sanderson [reasonably] determined that . . . the sale to a digester customer is a sale for use as a fuel, regardless of who pays whom." Appellant's Br. 55. And, according to Alternative Carbon, he also reasonably advised "that the then-newly enacted economic substance doctrine would not bar [Alternative Carbon] from claiming the credits based on the legislative history of section 7701(o)." *Id.* (citing J.A. 398).

Setting aside the question of whether Sanderson's advice included any unreasonable assumptions, Alternative Carbon cannot show that its reliance on his advice was reasonable. As the Claims Court correctly recognized, Sanderson repeatedly hedged his advice and demonstrated an incomplete understanding of Alternative Carbon's business. *See Alternative* Carbon, 137 Fed. Cl. at 34 ("[P]laintiff's primary adviser could not unambiguously endorse plaintiff's business model as late as July 2011—after

plaintiff had already claimed millions in alternative fuel mixture credits but had yet to claim millions more."); *see also* J.A. 1082 (Sanderson stating he "d[id] not have a full understanding of the economics" of Alternative Carbon's business); J.A. 1525 (asking which credit Alternative Carbon was trying to claim months after it began operating); *see also* J.A. 1311 (admitting he "didn't know who [Alternative Carbon's] customers were"). Sanderson's advice also depended on private letter rulings that he told Alternative Carbon could not be relied on as precedent. J.A. 1082. In light of these undisputed facts, and the record as a whole, we agree with the Claims Court that Alternative Carbon cannot establish that it had reasonable cause to claim the credits based on Sanderson's advice or otherwise.[8] *Alternative Carbon*, 137 Fed. Cl. at 32–34; *see also Russian Recovery Fund*, 851 F.3d at 1259 ("[W]hat elements *must* be present to constitute reasonable cause is a question of law."); *Stobie Creek*, 608 F.3d at 1381 (noting that the reasonable cause defense under § 6664 is "a narrow defense").

---

[8] Before the Claims Court, Alternative Carbon also argued that it relied on advice from other tax professionals. But the Claims Court concluded that their advice was cumulative of Sanderson's. *See, e.g.*, *Alternative Carbon*, 137 Fed. Cl. at 33 ("Mr. Lewis, by his own admission, provided no independent advice to plaintiff regarding sales, there was no such advice on which plaintiff could reasonably rely. The advice from Mr. Lewis was merely cumulative to the advice from Mr. Sanderson."). Alternative Carbon does not appear to challenge this conclusion on appeal. To the extent it intends to do so, moreover, we agree with the Claims Court. Likewise, we agree with the Claims Court that the IRS did not furnish any advice upon which Alternative Carbon could have reasonably relied. *Id.* at 32–33.

To the extent it might have been reasonable to rely on Sanderson's advice, moreover, Alternative Carbon cannot show that it followed his advice. In particular, Sanderson advised Alternative Carbon to charge "the user of the mixture for the fuel value." J.A. 1082. But Alternative Carbon offered no evidence it did so. *Alternative Carbon*, 137 Fed. Cl. at 33 ("[P]laintiff ignored Mr. Sanderson's advice to charge its customers for the fuel value when it instead charged its customers a flat fee for an undefined amount of its alternative fuel mixtures."); Oral Arg. at 2:24–40.

Finally, Alternative Carbon's partners should have recognized that receiving millions of dollars in tax credits for transferring feedstock from one entity to another—while mixing in a meaningless amount of diesel along the way—was "too good to be true." *Salem*, 786 F.3d at 960 ("[C]laiming nearly $500 million in foreign tax credits by subjecting income to economically meaningless activities was 'too good to be true.'"). This is yet another reason why Alternative Carbon cannot establish reasonable cause for claiming the credits. *Stobie Creek*, 608 F.3d at 1382.

For these reasons, we agree with the Claims Court that Alternative Carbon cannot show it had reasonable cause for claiming the alternative fuel mixture credits.

## III. CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. Alternative Carbon cannot show that it was entitled to claim the alternative fuel mixture credits under § 6426 nor can it show that it had reasonable cause to do so. Accordingly, the Claims Court properly entered summary judgment in favor of the government. We therefore affirm.

**AFFIRMED**

COSTS

No costs.